**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FIRST-CITIZENS BANK & TRUST COMPANY d/b/a SILICON VALLEY BANK, as Administrative Agent,<br><br>　　　　　　　　Plaintiff,<br><br>　　　v.<br><br>PATRIOT BANK, N.A.<br><br>　　　　　　　　Defendant. | Case No.: 1:26-cv-03810 (JSR) |

**DEFENDANT PATRIOT BANK, N.A.'s**
**<u>OPENING BRIEF</u>**

**MICHELMAN & ROBINSON, LLP**

Sanford L. Michelman*
10880 Wilshire Blvd.
Los Angeles, CA 90024
(310) 299-5500
smichelman@mrllp.com

Mona Z. Hanna*
Todd H. Stitt*
17901 Von Karman Ave., 10th Fl
Irvine, CA 92614
(714) 557-7990
mhanna@mrllp.com
tstitt@mrllp.com

Warren Koshofer, Esq.
Dmitriy Gelfand, Esq.
605 Third Avenue 30th Floor
New York, NY 10158
Tel.: 212-730-7400
wkoshofer@mrllp.com
dgelfand@mrllp.com

***\*Admitted Pro Hac Vice***

1

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

DEFENDANT'S POSITION................................................................................................. 2

    1.    There is No Irreparable Harm................................................................................... 2

    2.    SVB *Cannot* Prevail on the Merits by the Express Language of *all* Relevant Agreements, as such, there is "No Likelihood of Success on the Merits"............................... 4

        A.    The "Parker Program"....................................................................................... 4

            1.    The "Program Management Agreement" ("PMA")................................... 5

            2.    The "Receivables Sale Agreement" ("RSA")............................................ 6

CONCLUSION....................................................................................................................11

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bulman v. 2BKCo, Inc.*
    882 F. Supp. 2d 551 (S.D.N.Y. 2012)......................................................................................2

*Matter of Emergency Beacon Corp.*,
    665 F.2d 36 (2d Cir. 1981)...........................................................................................9, 10

*Jacobson & Co. v. Armstrong Cork Co.*,
    548 F.2d 438 (2d Cir. 1977).........................................................................................2, 3

**Statutes**

Commercial Code § 23-4 ............................................................................................10

**<u>INTRODUCTION</u>**

Plaintiff asks this Court to enter an injunction preventing Patriot Bank, N.A. ("<u>Patriot</u>") from servicing its own loan portfolio; credit card loans originated and owned by Patriot and owed by Patriot's customers. The basis for this extraordinary request is that the Fintech marketing company, Parker Group, Inc. ("<u>Parker</u>"), once possessed a contractual right to purchase Patriot loans, but that right ended when Parker ceased paying Patriot for loans originated *after* April 21, 2026, and subsequently filed for bankruptcy liquidation (Chapter 7).  Since Parker never paid for the Patriot loans originated *after* April 21, 2026 (the loans at issue here), the Plaintiff has no claim to them. This is not argument; Plaintiff concedes this in its Complaint at paragraph 39: "Under the RSA, Patriot sold and transferred 100% of its Purchased Receivables and all related proceeds to the Parker Group, without reservation and without any cut-off date.  *That obligation covers all receivables for which <u>Parker Group made payment</u>.*"  As such, since it is undisputed that Parker never paid for the loans originated *after* April 21, 2026, Plaintiff's request for injunctive relief must be denied.

The record is straightforward. While Parker at one time held a contractual option to purchase Patriot loans, Parker stopped paying Patriot for loans originated after April 21, 2026, and then filed for bankruptcy. Under the express terms of the governing agreements, Parker was required to "pay" Patriot the applicable "Purchase Price" before any loan could be transferred or acquired. It is undisputed that Parker failed to make those payments.

Plaintiff's request for injunctive relief therefore collapses both legally and factually. Plaintiff cannot establish irreparable harm because the alleged injury is purely monetary and fully compensable through damages. Nor can Plaintiff demonstrate any likelihood of success on the merits where the undisputed facts establish that Parker never paid Patriot for the loans, and

therefore never acquired ownership of the loans at issue.

Having failed to purchase the loans, Plaintiff cannot now seek to enjoin Patriot from servicing and collecting on loans that Patriot originated, owns, and services for its own customers. The Motion should be denied in its entirety.

**DEFENDANT'S POSITION**

**1.      There is No Irreparable Harm**

It is well established that in order to obtain injunctive relief, the moving party must demonstrate "a likelihood of irreparable harm in the absence of preliminary relief". *Bulman v. 2BKCo, Inc.* 882 F. Supp. 2d 551, 558 (S.D.N.Y. 2012).  Here, Silicon Valley Bank ("SVB") seeks repayment of the money it lent to its now bankrupt borrower, Parker, to pay for the purchase of loans from Patriot. Specifically, Parker entered into a contract with Patriot to provide marketing and loan servicing to Patriot on loans that Patriot originated ("Receivables") and it had the right to buy those loans from Patriot with the money it borrowed from SVB (*See*, SVB Loan and Security Agreement). Unfortunately, Parker became insolvent, and stopped purchasing the Patriot loans after April 21, 2026, and then filed for bankruptcy protection leaving SVB with apparently no ability to get repaid. Shockingly, SVB is now scrambling to try to get money from Patriot borrowers repayment streams on loans that Parker never purchased.  This is only about money damages.

Recognizing that it cannot establish irreparable harm, SVB attempts to invoke the "good-will" rationale discussed in *Jacobson & Co. v. Armstrong Cork Co.*, 548 F.2d 438, 444–45 (2d Cir. 1977), contending that Parker may suffer reputational injury if Patriot services and collects on credit card loans that Parker never purchased. The argument is clearly not credible.

*First*, the credit card borrowers at issue are and always have been *Patriot customers*. They

2

applied for and opened accounts with Patriot, borrowed funds from Patriot, and entered into direct "creditor-borrower" relationships with Patriot as set forth in the contract. Instead, Parker's rights extended only to the potential purchase of "Receivables" upon payment of the applicable "Purchase Price" to Patriot – an expressed condition precedent Parker indisputably failed to satisfy. As such, SVB's "good will" argument fails.

*Second,* SVB contends that the loans at issue that Parker never paid Patriot for (discussed below) serves as "collateral" for the money Parker borrowed to buy *prior* loans, and as such, that money may be lost. By its own argument, SVB is simply seeking money – nothing more.

*Third*, SVB then contends that Parker's "good will" will be destroyed if Patriot seeks collection on the debt it is owed by borrowers on credit card loans after April 21, 2026, when Parker stopped buying them, resulting in making the recovery of money (again, money) difficult for SVB. This argument, of course, highlights that this dispute is only about money.

*Fourth*, SVB then argues that there will be harm to the Parker credit card customer relationship as was discussed in *Jacobson* ("…loss of the Armstrong [product] line would jeopardize [plaintiff's] good will and create a risk of 'immeasurable harm' should [plaintiff's] customers and potential customers turn to competitors."). This argument is equally not credible. Unlike in *Jacobson*, Parker filed bankruptcy and then its CEO (Yacine Sibous) told *all* of its customers that it filed bankruptcy and to directly contact Patriot to settle their accounts. Exhibits 1 & 2. The facts are not even close. What possible "good will" exists between defunct Parker and its customers since Parker no longer has any operations or customers? ***None.*** There is no "good will" to protect, and this dispute is just about money.

As such, even on the most liberal interpretations of "irreparable harm" SVB cannot make any such showing. SVB is trying to get money that Parker borrowed and nothing more. On this

basis alone, Plaintiff's request for Preliminary Injunction should be denied.

2. **SVB *Cannot* Prevail on the Merits by the Express Language of *all* Relevant Agreements, as such, there is "No Likelihood of Success on the Merits"**

What is undisputed is that Parker became insolvent, and as of April 21, 2026, forward, it never paid Patriot for any of the then-originated loans, then went bankrupt. As such, Patriot still owns the post-April 21, 2026, Receivables at issue in this case. What has become clear is that Parker's bankruptcy resulted in *Parker's* lender, SVB, being left with an uncollectable loan due from *Parker[1]*. As a means to try and get paid back for its loan to Parker, SVB literally must ignore the fact (and not disclose it to the Court) that Parker never paid Patriot's for the Receivables at issue as expressly required by the agreements. Instead, SVB weaves together an argument that requires this Court to ignore the plain language of the contracts. Stated more bluntly, SVB's sought after Preliminary Injunction is being brought in bad faith as will be demonstrated herein and at hearing. As such, given SVB cannot prevail as a matter of law, its request for an injunction should be denied.

A. **The "Parker Program"**

In 2023, Parker approached Patriot to be the "sponsor" bank to issue credit card loans to small businesses. The reason for this relationship was that Parker was not, and is not, a bank. Parker does not hold any licenses that would allow it to legally make credit card loans. Instead, it needed a sponsor bank, like Patriot, to do so. After negotiations, the parties entered into two central

---

[1] As described herein, Patriot agreed to sell to Parker the loans Parker generated from its marketing efforts, but as an *expressed condition precedent* to the loans transferring to Parker, Parker had to "**pay**" Patriot for the loans. Apparently, Parker obtained a credit line from SVB to use to "**pay**" Patriot for the loans. When Parker went bankrupt, SVB was owed money from Parker; hence the only reason SVB is involved in this matter. SVB is now trying to lay claim to loans Parker *never paid Patriot* for as a means to reduce the debt Parker owes SVB. However, SVB's entire claim is wholly unsupported by the agreements between Patriot and Parker and is completely frivolous.

4

agreements.  They are discussed below.

### 1.    The "Program Management Agreement" ("PMA")

The PMA was entered into on June 15, 2023 by and between Patriot and Parker (Parker is referred to as the "Program Manager").  Exhibit 3. The premise behind the PMA is that Parker would act as a marketer to the public to generate borrowers for the credit card program.  In addition, Parker would act as the "servicer" of the credit card loans, *on behalf of Patriot*. At its core it is just a marketing and servicer agreement.  The relevant sections are below[2].

> WHEREAS, Program Manager provides program management, marketing, and loan servicing services for branded commercial use credit cards and other loan products to banks; and

> WHEREAS, Bank wishes to retain Program Manager to provide such services at ***Bank's directions and supervision***;

> Section 2 sets forth ("<u>Marketing of Loan Program and Marketing Materials</u>") Parker's role:

> (a) Program Manager shall be responsible for all marketing and promotion of the Program and Loan Accounts….Program Manager shall submit all materials that Program Manager intends to use to market the Program…to Bank for its ***prior review and approval***. Once approved…may be used by the Program Manager unless or until Bank withdraws its approval.

> Section 3 states ("<u>Bank to Extend Credit</u>") the relationship is with Patriot, not Parker:

> (a) Upon approval of any Application by Program Manager on ***Bank's behalf***, Bank shall establish a ***Loan Account*** for the Applicant. Program Manager acknowledges that approving an Application for a Loan Account ***<u>creates a creditor-borrower relationship between Bank and the Borrower</u>***.

> Section 4 states ("<u>Consumer Finance Materials</u>") Patriot owns all unpurchased loans:

> (a) …Each ***Loan Account*** Agreement and all other documents referring to the creditor is connection with the Loan Account ***shall identify Bank as the creditor <u>so long as Bank owns such Loan Accounts</u>***.

The parties agreed that Parker could market the credit card program, but the relationship with the borrower would be with the Patriot (Section 3(a)), and that until Parker paid Patriot for

---

[2]  All italics and bold are added for emphasis.

the Receivables, Patriot continued to own them (Section 4(a)), and even if Parker bought the Receivables, Patriot continued to own the borrower's Loan Accounts (Section 3(a) "Bank retains ownership of the Loan Account"), and the ongoing client relationship including future Receivables (Section 3(a)). Stated more clearly, until Parker paid Patriot for the Receivables, Patriot continued to own everything related thereto. This understanding is memorialized in the sales agreement.

## 2.    The "Receivables Sale Agreement" ("RSA")

On the same day as the PMA, the same parties entered into the RSA. Exhibit 4. The parties are Patriot, as "Bank", and Parker, as "Buyer".  The language of the RSA is clear and unambiguous. Patriot is the sole owner of all unpurchased Receivables.

> WHEREAS, Bank and Buyer have simultaneously entered into a Program Management Agreement ("Program Agreement"), incorporated herein by reference, pursuant to which Bank originates various types of consumer loans that are marketed by Buyer;
>
> WHEREAS, Bank desires to **sell** to Buyer, and Buyer desires to **purchase** from Bank, all Receivables generated by Bank pursuant to the **Loan Accounts** originated under the Program Agreement under the terms set forth herein.

Section 2 states ("Purchase of Receivables; Payment to Bank…") that Parker is expressly required to pay for the Receivables for ownership to transfer from Patriot to Parker:

> (a) Bank hereby agrees to sell, transfer, assign, set-over, and otherwise convey to Buyer, without recourse (except as expressly provided herein) and with **servicing released**, (i) one hundred percent (100%) of the Receivables generated by Bank and funded by Bank during the Term (the "**Purchased Receivables**"), (ii) all collections, insurance proceeds, interchange and recoveries on or allocable to such Receivables, (iii) all monies due or become due with respect to the foregoing, (iv) all amounts received with respect to all the foregoing, and (v) all proceeds thereof (collectively, the "**Purchased Assets**"), on the third Business Day **after** the day on which Receivables were funded by the Bank….In **consideration** for Bank's agreement to sell, transfer, assign, set-over, and otherwise convey to Buyer the **Purchased Assets** during the Term, **Buyer agrees to purchase** all of Bank's right, title and interest in and to such Receivables, and Buyer **shall pay to Bank** the **Purchase Price** on each **Closing Date** in accordance with Section 2(b) below.

6

The "Purchase Price" as defined in the RSA "…means as to each **Closing Date** and as to each Receivable, the principal amount of the Loan Account Advance related to such Receivable". This means that Parker "shall pay to bank" the amount of the Receivable *before* ownership transfers. In fact, the "Closing Date" as defined in the RSA "…means each date on which the Buyer **_pays Bank_** the **Purchase Price** for a Receivable and, pursuant to Section 2 hereof, **_acquires_** such Receivable from Bank." (*See*, RSA, Schedule 1, Definitions).  The definition of "Closing Date" makes it clear that as a condition precedent to Patriot releasing its rights – including *servicing* – Parker must first "pay" for the Receivables.  If Parker does not "pay" for the Receivables, Patriot retains ownership[3].  This is precisely what is at issue in this matter; namely, the Receivables Parker did not pay Patriot that originated on or after April 21, 2026 since SVB cut off its funding to Parker to purchase them, and Parker then went bankrupt.  Section 2(b) continues:

> …Buyer shall prepare and deliver to Bank…a Daily Purchase Statement…**_Buyer shall make payment to Bank_** of the Purchase Price as described on the applicable Daily Purchase Statement. **_Buyer's daily payment_** of the Purchase Price **_shall be made by wire or other transfer in immediately available funds_** to an account designated by Bank.

Section 2(c) even goes so far as to provide an efficient way for Parker to "pay" Patriot for the Receivables so there can be a "Closing Date".

> In the event Buyer does not **_pay Bank_** the Purchase Price on any given **Closing Date**, Bank shall have the right to withdraw from the Collateral Account an amount equal to the Purchase Price.

> Section 3 states ("<u>Ownership of Loan Accounts and Receivables</u>") that only once there is

"payment" by Parker for the Receivables to Patriot will Parker be the owner of the Receivables –

---

[3] Plaintiff's Motion attaches Brian Foley's declaration *under oath* testifying in paragraph 14 that SVB only a has "first priority security interest" in "purchased receivables" but fails to disclose to this Court that Parker never paid Patriot for the "Purchased Receivables" after April 21, 2026, and as such, those Receivables are still owned by Patriot.  (*See*, RSA Sections 2 and 3).  This is a material omission.

*but not before.* In fact, the RSA mandates that Parker cannot record the Receivables on its "books and records" until it first "pays" Patriot for them.

> (b) ***On or after*** each ***Closing Date***, Buyer shall be the sole owner for all purposes (*e.g.*, tax accounting and legal) of the ***Purchased Receivables purchased from Bank*** on such date….Buyer agrees to make entries on its ***books and records*** to clearly indicate the purchase of the ***Purchased Receivables as of each Closing Date***.

This section makes it clear that Parker cannot record *any* ownership of the Purchased Receivables *prior* to the "Closing Date" – the date in which Parker "shall pay Bank". Therefore, until and unless Parker pays Patriot for the Receivables, Patriot retains ownership in the Receivables. In fact, Section 3 continues to make it clear that the RSA is not a secured financing to eliminate any issue that there is a security interest in any *unpurchased* Receivables. SVB ignores this section.

> (c) The Parties hereto intent that the conveyance of Bank's right, title, and interest in and to the ***Purchased Receivables*** and the other ***Purchased Assets shall constitute an absolute and irrevocable sale*** and ***not a secured borrowing***, including for accounting purposes.

Despite SVB's allegation it has a "security interest" in *unpurchased* Receivables, the RSA makes it clear that it not true or accurate. To get around the clear and unambiguous language between Parker and Patriot, SVB is alleging that it is: (1) a third-party beneficiary for loans Parker never paid for, and (2) Parker assigned *unpurchased* Receivables to SVB. Neither of these arguments make sense or are remotely supported by the plain language of the documents. Section 16 ("Third-Party Beneficiaries") of the RSA states: "Nothing contained herein shall be construed as creating a third-party beneficiary relationship between either Party or Person….[4]" Thus, SVB's claim of being a third-party beneficiary in *unpurchased* Receivables is not true.

---

[4] Section 38 identifies that once Parker "pays bank" and owns the Receivables, it may assign the Receivable to a third-party, and that third-party may be a third-party beneficiary. But that only applies once Parker "pays" Patriot for the Receivables.

So too does SVB's claim of being an assign. Section 14 ("Assignment") of the RSA states: "The Sale Agreement and the rights and obligations created under it shall be binding upon and inure solely to benefit of the Parties and their respective successors, and permitted assigns." The RSA is clear; the only assignment that can be made by Parker, to which Patriot must agree, is for those loans Parker actually paid for and purchased. In addition, Section 14 expressly states that a "permitted assigns" our bound by the "obligations created" thereunder, which is an obligation to "pay" Patriot for the Receivables to generate a "Closing Date." This of course makes sense; Patriot would never agree to assign its assets (i.e., loans it funded to borrowers) to a lender of Parker (i.e., SVB) if Parker never paid Patriot for them, and Parker cannot sell what it does not own. *See, Matter of Emergency Beacon Corp., infra.*

In fact, section 38 ("Acknowledgement and Agreement of Bank") should end any debate that SVB is not an "assign" of *unpurchased* Receivables.[5]

> Bank expressly acknowledges and agrees that all of the Buyer's right, title, and interests in, to, and under this Agreement, including all of the Buyer's right, title, and interests in, to, and under the ***Purchased Assets***, may be assigned by the Buyer to a Buyer Assignee, and Bank consents to such assignment….

It is expressly stated that Parker can only assign Receivables it paid Patriot to acquire as "Purchased Assets". This makes sense of course, because Parker cannot assign what it does not

---

[5] In Plaintiff's Complaint, and Motion, it represents to this Court that Patriot permitted a UCC-1 to be filed on June 28, 2023 in favor of Parker as evidence of an "assignment" of unpurchased Receivables (*see*, Complaint at Paragraph 15, and page 5 of the Motion). However, Plaintiff never attached the UCC-1 because it does not state what Plaintiff's represent to this Court. Attached to the UCC-1 is "Exhibit A" that expressly incorporates by reference the "Receivables Sale Agreement" identifying the UCC-1 only applies to Receivables Parker paid Patriot. Moreover, on June 28, 2026, the parties filed an updated UCC-1 stating: "Secured Party Name" and it lists "PATRIOT BANK, N.A." (which Plaintiff never discloses), and "PARKER GROUP, INC. (AS RECEIVABLE PURCHASER)". Meaning, the UCC-1 only applies to Parker once it "pays" Patriot for the Loan Accounts thereby creating a "Closing Date". Stunning is that Plaintiff never discloses this critical and material fact in any of its fillings. *See*, Attached UCC-1 as Exhibits 5 & 6.

own. *See, Matter of Emergency Beacon Corp.*, 665 F.2d 36, 40 (2d Cir. 1981) (citing *J. White & R. Summers*, Uniform Commercial Code § 23-4, at 916 (2d ed. 1980) ("if the debtor has no rights in the collateral, no security interest in that collateral comes into existence")).  It is undisputed that Parker never paid Patriot for the Receivables from April 21, 2026 forward, and as such, Patriot still owns them and never relinquished "servicing". *See*, Section 2 above.

SVB's argument that it has a security interest in Receivables Parker never paid for is not only expressly contradicted by the RSA, but it also belies any logic whatsoever.  This is not merely rhetoric, SVB's own "Loan and Security Agreement" ("LSA") contradicts its argument.  Exhibit 7 (relevant pages). Specifically, SVB's LSA is designed to permit Parker's subsidiary as a borrower to use the SVB credit line funds to "*pay*" Patriot for the loans it originated and use those loans as collateral for SVB loan.  In fact, and *what is fatal to SVB's entire position*, is that the expressed terms of the LSA state that Parker *cannot* use loans it did not pay Patriot for as collateral. This means SVB cannot claim to have a security interest in loans it prohibited Parker from borrowing against.

Section 4.1 ("Borrower Representations") states Parker represents to SVB that it paid Patriot for the Receivables for there to be valid collateral to SVB:

> (p)(i)(A) Immediately **prior to the transfer** of each of Receivable to the Borrower [Parker subsidiary that borrowers from SVB's credit line], the Seller [Parker] has good and marketable title to and was the sole registered owner of each Receivable that the Seller sold to Borrower, (B) the Borrower validly purchased each such Receivable from the Seller thereof…

> (vi) With respect to each Receivable designated as an **Eligible Receivable** on any Barrowing Base Certificate…the Borrower warrants and represents to the Administrative Agents and Lenders…that (i) such Receivable constitutes and **Eligible Receivable**…"

An "Eligible Receivable" is one that falls within the "Eligible Criteria" set forth by SVB, which states unambiguously, "(bb) if a Charge Card Receivable, the Receivable was sold to the

10

Parent [Parker] by the Originating Bank [Patriot] pursuant to the Originating Bank sale agreement [RSA]…." *See*, LSA, Schedule 1.1A, Definitions. Again, it is undisputed Parker never paid Patriot for Receivables after April 21, 2026, and those loans are not "eligible" to be used as collateral for the SVB loan.  To this point, as discussed above, Parker is prohibited from even recording the Receivables on its "books and records" *prior* to paying Patriot to "acquire" them. (*See*, RSA, Section 3: "***On or after*** each ***Closing Date***, Buyer shall be the sole owner for all purposes (*e.g.*, tax accounting and legal) of the ***Purchased Receivables purchased from Bank*** on such date….Buyer agrees to make entries on its ***books and records*** to clearly indicate the purchase of the ***Purchased Receivables as of each Closing Date"***).

Moreover, the LSA even clarifies that the "Grant of Security Interest" (*See*, LSA, Section 3.5) in the "Borrower Collateral" can only be in those Receivables "acquired" by Parker. (*See*, Schedule 1.1A, Definitions). Under no interpretation of *any* of the documents does SVB have a security interest, and has any good faith claim to precluded Patriot from "servicing" its own customers.

As such, it is factually impossible for SVB's argument to prevail since its own LSA prohibits its borrower from granting a "security interest" in Receivables it does not own, do not qualify as "eligible", and specifically, Parker never paid Patriot to "acquire".  SVB's request that Patriot be precluded from "serving" its own credit card borrowers that Parker never purchased is frivolous and should be denied.

**CONCLUSION**

In conclusion, Defendant respectfully submits the following four questions, based on the parties' contracts, to assist the Court at Hearing and establish Plaintiff's request should be denied:

1. **Is Parker an ongoing concern that would create an issue of customer "good will"?**

11

    a.   If no, then there is no alleged "irreparable harm," and Plaintiff's request should be denied.

        i.   Parker went bankrupt and notified the world that it is no longer operational and should contact Patriot directly. As such, there can be no lost "good will" and in turn, "irreparable harm" since Parker itself destroyed it. Exhibits 1 & 2.

2. **Assuming, arguendo, that Irreparable harm exists, then:**

    a.   Has Plaintiff submitted evidence that ***on or after April 21, 2026*** Parker "paid" Patriot to create the required "Closing Date" to "acquire" the "Receivables"? (*See*, RSA §§2(a) and (b))

        i.   As will be seen at hearing, the answer will be admittedly "**No**".

3. **If no "Closing Date" occurred, is Plaintiff a Third-Party Beneficiary in the *unpurchased* Receivables?**

    a.   If no, then Plaintiff has no entitlement to the payment streams of the ***unpurchased*** Receivables and prevent Patriot from contacting its own customers.

        i.   The answer is undisputedly "**No**". Section 16 ("<u>Third-Party Beneficiaries</u>"): "Nothing contained herein shall be construed as creating a third-party beneficiary relationship between either Party or Person…."

4. **If no "Closing Date" occurred, did Patriot "assign" its rights to Parker, and in turn Parker assign its rights to SVB, to the *unpurchased* Receivables?**

    a.   The answer "**No**" as set forth in Section 2 of the RSA as it states Parker "shall" first "pay" Patriot for the Receivables to be considered "Purchased Assets", and Section 38 of the RSA states that only "Purchased Assets" are "assigned" to Parker, and in turn, any financing lender Parker may have. It is undisputed Parker never paid

Patriot for Receivables after April 21, 2026.

b. While Patriot is not a party to the LSA, the LSA equally states that Parker cannot "sell" Receivables to its subsidiary to be use as "collateral" to borrow money from SVB's credit line if Parker did not pay for and "acquire" the Patriot Receivables[6]. (*See*, LSA, Schedule 1.1A, Definitions). In addition, the LSA states that SVB will not lend against Patriot Receivables Parker did not pay for and "acquire". (*See*, LSA, Section 4). It is undisputed that Parker never paid Patriot for the Receivables after April 21, 2026, thereby creating a "Closing Date", allowing for Parker to enter the Receivables on its "books and records" (*See*, RSA, Section 3(b)), thereby rendering the post-April 21, 2026 Receivables as *not "Eligible".* As such, even by Plaintiff's own documents, it has no claim to the post-April 21, 2026 Receivables.

Dated: May 18, 2026            **MICHELMAN & ROBINSON, LLP**

By:    /s/ Sanford L. Michelman
     Sanford L. Michelman, Esq.
     Mona Z. Hanna, Esq.
     Todd H. Stitt, Esq.
     Warren A. Koshofer, Esq.
     Dmitriy Gelfand, Esq.
     605 Third Ave., 30th Fl
     New York, NY 10158
     (212) 730-7700
     smichelman@mrllp.com
     mhanna@mrllp.com
     tstitt@mrllp.com
     wkoshofer@mrllp.com
     dgelfand@mrllp.com

*Attorneys for Patriot Bank, N.A.*

---

[6] What appears to have happened is that Parker misrepresented to SVB that it was using the credit line funds to pay Patriot for the Receivables and never did, typical "asset backed" lender fraud. As unfortunate as that may be, this is not a Patriot issue, but one for Plaintiff in the Parker bankruptcy court.

13