UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIRST-CITIZENS BANK & TRUST COMPANY,
AS ADMINISTRATIVE AGENT, DOING
BUSINESS AS SILICON VALLEY BANK,

        Plaintiff,

    -v-

PATRIOT BANK, N.A.,

        Defendant.

26-cv-3810 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

On May 21, 2026, the Court entered a "bottom-line" Order denying the motion of plaintiff First-Citizens Bank and Trust Company -- which as relevant to this action does business as Silicon Valley Bank ("SVB") -- for a preliminary injunction against defendant Patriot Bank, N.A. ("Patriot"). See ECF No. 30. This Opinion sets forth the reasons for that Order.

SVB initiated this action on May 7, 2026, bringing claims for breach of contract (Count One), declaratory judgment (Count Two), and tortious interference with contract (Count Three). See ECF No. 1 ("Compl."). Shortly thereafter, SVB moved for a temporary restraining order, a preliminary injunction, and expedited discovery pending a hearing. See ECF No. 7. On May 13, 2026, the Court heard oral argument on SVB's motion for a temporary restraining order, obtained the parties' voluntary agreement to certain measures that would temporarily maintain the status quo, and denied the motion for a temporary restraining order. See ECF No. 20.

1

On May 20, 2026, after receiving full briefing, the Court held a full-day evidentiary hearing on SVB's motion for a preliminary injunction. On May 21, 2026, the parties submitted post-hearing briefs, and on that same date, the Court entered the aforementioned bottom-line Order denying SVB's motion. See ECF No. 30. On May 22, 2026, the parties submitted a Case Management Plan proposing deadlines to govern the remainder of this action, ECF No. 31, and the Court approved that plan on May 26, 2026, ECF No. 32.

I. Factual Findings

At the preliminary injunction hearing held on May 20, 2026, the Court heard testimony from three witnesses: SVB executive Blake Lepire, who supervises SVB's so-called "warehouse" lending portfolio; Patriot president and chief executive officer Steven Sugarman; and Patriot chief financial officer Carlos P. Salas. Each witness was personally involved in certain events at issue in this case. The Court also received numerous exhibits, primarily consisting of contracts and correspondence involving SVB, Patriot, Parker Group, Inc., Parker Warehouse III LLC, and Carmel Solutions, Inc. Based on the evidence received at the hearing, the Court makes the following findings of fact for the purposes of assessing the instant motion.

For just under three years, Patriot collaborated with financial technology firm Parker Group, Inc. ("Parker") with respect to a charge-card program for small businesses. Marketed as the "Parker Card," the program offered cardholders a choice among several distinctive repayment terms. See generally Plaintiff's Exhibit ("PX") 24. Whereas

the issuers of traditional charge and credit cards send customers monthly statements, with repayment of the whole month's charges due shortly after a statement is issued, the Parker Card program enables cardholders to repay each individual charge a specified number of days after that specific charge is made. See id. at 2; Tr. at 94-95.[1] According to promotional materials for the Parker Card, these repayment terms offer cardholders "complete freedom" and thereby "transform" their business cash flows. PX 24 at 4, 6. But because "Parker is a financial technology company, not a bank," id. at 6-7, it could not issue the Parker Card, or access the Mastercard network of merchants, on its own, see Tr. at 146-47. Accordingly, Parker entered into an arrangement under which Patriot, a federally chartered bank and a member of the Mastercard network, would issue the Parker Card, while Parker would service Parker Card customers' accounts.

A.    Agreements between Parker and Patriot

Two agreements, which were executed simultaneously on June 15, 2023, govern the relationship between Parker and Patriot. The first is the Receivable Sales Agreement ("RSA"). See PX 1; Defense Exhibit ("DX") 4.[2] As relevant to the parties' dispute, the RSA provides that

---

[1] Citations to "Tr." are to the transcript of the preliminary injunction hearing held on May 20, 2026. Except where otherwise indicated, all quotations in this Opinion omit citations, internal quotation marks, footnotes, brackets, ellipses, and other such non-substantive alterations in source material.

[2] At the preliminary injunction hearing, several documents were introduced into evidence by both SVB and Patriot. On the first reference to any such document, the Court cites both plaintiff's and defendant's exhibit number to that document, but, for convenience, the Court thereafter cites only the plaintiff's exhibit number.

Patriot would sell "one hundred percent (100%) of the Receivables generated by [Patriot] and funded by [Patriot]" during the term of the agreement, plus certain ancillary receivables, and that Parker would "purchase all of [Patriot's] right, title[,] and interest in and to such Receivables. RSA § 2(a). Parker would "pay to [Patriot] the Purchase Price on each Closing Date." Id. The parties agreed that the RSA's initial term would be the three-year period running from June 15, 2023, through June 15, 2026. See id. § 10(a).

The RSA provides that, on each relevant date, Parker would "prepare and deliver to [Patriot]" a statement listing all the receivables that Patriot would sell to Parker on that date; in return, Parker would "make payment to [Patriot] of the Purchase Price" for those receivables "by wire or other transfer in immediately available funds." Id. § 2(b). To ensure prompt payment, the RSA required Parker to establish a "Collateral Account," meaning a "deposit account" at Patriot, in Parker's name, that would "serve as cash collateral for [Parker's] obligations under this Sale Agreement." Id. § 35(a). The parties originally agreed that Parker would maintain in the Collateral Account a "Required Balance" of no less than three times the Parker Card program's average daily activity. Id.; see id., Sched. 1, (nn). But, on February 2, 2026, Patriot and Parker amended the RSA to, among other things, lower the Required Balance to a flat $600,000. PX 10 at 2; see Tr. at 202-05.[3]

_____

[3] Parker did not promptly inform SVB that it and Patriot had amended the RSA, and SVB personnel only became aware of the amendment on or

Although the RSA provides that the parties "intend that the conveyance of [Patriot's] right, title, and interest in and to" the receivables at issue "shall constitute an absolute and irrevocable sale and not a secured borrowing," the RSA contains provisions that would be triggered by a judicial finding that the parties' transaction was "a loan rather than an absolute transfer." See RSA § 3(c). In that event, the RSA provides that it "shall be deemed to be, and hereby is[,] a security agreement" and that Patriot "hereby grants to [Parker] a first priority perfected security interest in, to[,] and under all of [Patriot's] right, title[,] and interest" in the receivables. Id.[4]

Finally, the RSA provides that Parker may assign any interest that it acquires under the RSA, as well as that any such assignee of Parker's "shall be an express third party beneficiary of this Agreement with the right to enforce it." Id. § 38.

The second agreement between Patriot and Parker is the Program Management Agreement ("PMA"). See PX 2; DX 3. At a high level, the PMA sets forth the parties' respective spheres of responsibility for the administration of the Parker Card program. Under the PMA, Parker is responsible for marketing the program, see PMA §§ 2, 5, and servicing loan accounts, see id. § 7, while Patriot is responsible for establishing loan accounts, see id. § 3, obtaining certain regulatory

_____

about May 2, 2026, at which point Parker was already in significant financial distress. See Tr. at 121, 128-30.

[4] To effectuate this provision of the RSA, Parker filed with the Secretary of the State of Connecticut, on June 28, 2023, a "UCC Financing Statement" providing that Patriot had granted Parker a security interest in the receivables covered by the RSA. PX 3; DX 5.

approvals, see id. § 4, and maintaining its membership in the Mastercard network, see id. § 9. The PMA provides that the parties' "relationship shall be non-exclusive." Id. § 11(a). It enumerates a range of circumstances in which either party may terminate the PMA, see id. § 13(b), and it sets forth how, if the PMA is terminated, the parties will wind down their relationship, see id. § 14. As relevant here, the PMA's wind-down provisions include the requirement that "[i]n no event shall a Party make any public statement or customer communication regarding the termination or wind-down of this Agreement or the Program without the express prior written approval of the other Party, which approval shall not be unreasonably withheld or delayed." Id. § 14(g).

Like the RSA, the PMA authorizes Parker to assign "a security interest and lien on all right, title[,] and interest of [Parker] in, to[,] and under this Agreement and the [RSA] to a purchaser, transferee[,] or assignee" of the receivables at issue. Id. § 24.

B.    Further Agreements

In 2025, Parker entered into a financing arrangement with SVB, pledging the receivables purchased under the RSA as collateral for a revolving credit facility of up to $125 million. To effectuate this arrangement, Parker first transferred the receivables to its affiliate Parker Warehouse III Holdco LLC, via a "First Step Purchase and Sale Agreement" dated February 25, 2025. PX 4. That agreement was accompanied by a simultaneously executed "First Step Omnibus Assignment" by which Parker assigned its interests under the RSA and

6

PMA to Parker Warehouse III Holdco LLC. PX 5. Parker Warehouse III Holdco LLC then repeated the process, conveying the receivables and assigning its interests under the RSA and PMA to Parker Warehouse III LLC ("Parker Warehouse") via simultaneous "Second Step" agreements. PX 7, PX 8. SVB's executive Lepire testified that the purpose of this two-step process was to "create[] a degree of separation," for asset protection purposes, between Parker's creditors and Parker Warehouse. See Tr. at 22.

Also on February 25, 2025, Parker Warehouse entered into a Loan and Security Agreement ("LSA") with SVB and other lenders. PX 12; DX 7.[5] Under the LSA, for which SVB served as "administrative agent," Parker Warehouse granted SVB and the other lenders a continuing, first-priority security interest in the receivables in exchange for access to "revolving loan facilit[ies]" in a total "maximum principal amount" of up to $125,000,000. LSA, Recitals; id. § 3.5. Simultaneously with the execution of the LSA, SVB filed with the Delaware Department of State two UCC Financing Statements asserting a security interest in the receivables. PX 6, PX 9. One financing statement named Parker as the debtor and Parker Warehouse III Holdco LLC as Parker's assignee, see PX 6 at 3; the other named Parker Warehouse III Holdco LLC as the debtor and Parker Warehouse as its assignee, see PX 9 at 3.

The last agreement at issue in this action is a Backup Servicing Agreement ("BSA") executed between Parker Warehouse, SVB, Parker, and

---

[5] The parties twice amended the LSA, once on November 24, 2025, and a second time on February 25, 2026. See PX 12 at 1-5. The amendments are not material to the Court's analysis.

Carmel Solutions LLC ("Carmel"). PX 11. The parties initially executed the BSA on February 25, 2025, the same date that they initially executed the LSA, and they amended and restated the BSA on February 23, 2026. Id. at 1. As amended and restated, the BSA provides that, if Parker becomes unable to continue servicing Parker Card receivables or if another defined event of default occurs, SVB may terminate Parker's servicing responsibilities and appoint a successor servicer. Id., Ex. A §§ 4.1, 4.2. Upon being appointed as successor servicer, Carmel must "follow the instructions from [SVB,] and [SVB] may exercise" all of Parker's "consent rights" under the BSA. Id. § 13(b). To effectuate any such transition in servicing responsibilities, Carmel, upon being appointed as successor servicer, must "immediately cease following instructions from [Parker]." Id.

C.    Parker's Bankruptcy and Related Events

On May 3, 2026, Parker's chief executive officer, Yacine Sibous, sent a blind-copied email entitled "Notice: Parker workforce action tonight." DX 9; see Tr. at 106-07. The email, which was received by SVB's Lepire and Patriot's Sugarman (presumably among other people), announced that, "following deliberation with counsel and approval by the Parker board of directors . . . , Parker will terminate all employees effective 11:59pm Eastern Time tonight." DX 9; see Tr. at 106, 166. Sibous explained that Parker was taking this action after concluding that it could no longer "satisfy its obligations as they come due." DX 9. On May 5, 2026, at least one Parker Card customer received an email from an apparently terminated Parker employee,

Katherine McGann, directing the customer to contact Patriot for "card-related questions" and to contact SVB for "treasury-related questions." DX 2. Then, on May 7, 2026, Parker filed for protection under Chapter 7 of the Bankruptcy Code. DX 10; see In re Parker Grp., Inc., No. 26-10694 (Bankr. D. Del.). Sibous announced the bankruptcy filing via social media on May 9, 2026. DX 1.

Several weeks earlier, Parker's deteriorating financial condition had begun to affect the operation of the Parker Card program. See Tr. at 45-46. Starting on April 21, 2026, Parker began "recycling" more than $13 million of customer funds. See PX 13; Tr. at 52-55. That is, Parker began drawing down for its immediate use certain funds that Parker Card customers had paid SVB in satisfaction of charges on their cards. See Tr. at 56-58. Because such funds would not ordinarily be available to Parker until after the next monthly "payment date," it can be inferred that Parker's recycling activities were an indicator of financial difficulty. See id. Parker continued purchasing receivables from Patriot until April 28, 2026, but thereafter, SVB began to refuse Parker's recycling requests. See id. at 38-39. The final receivables for which Parker made payment to Patriot pertained to charges incurred by Parker Card customers on April 20, 2026, and April 21, 2026. See PX 23 at 4; DX 13 at 4; Tr. at 48-49, 225-26.[6] Thus, Parker failed to make payment for receivables pertaining to

---

[6] Although the RSA provides that Parker would purchase all receivables "on the third Business Day after the day on which such Receivables were funded by [Patriot]," RSA § 2(a), the Court heard uncontested testimony that Patriot occasionally permitted Parker to make payment a few days later, Tr. at 254.

charges incurred by Parker Card customers on or after April 22, 2026. See PX 23 at 4-5; see also DX 8 (correspondence indicating Patriot notified Parker of funding deficiency on April 30, 2026); Tr. at 37-38. On May 4, 2026, SVB sent Parker a "notice of default and servicer termination notice," citing alleged breaches of the RSA and PMA. See Tr. at 40-41, 111.

As of the date of the preliminary injunction hearing, the unpaid-for receivables totaled more than $21 million. See PX 23 at 8; Tr. at 236.[7] Although Parker had ceased to be a going concern, Lepire testified that Parker's electronic systems for receiving cardholder payments were, as of the date of the preliminary injunction hearing, "still functioning," with such payments "accumulating in the Parker Warehouse collection account." Tr. at 58-59, 73-74. But Salas, Patriot's chief financial officer, testified that it was SVB, not any automated system, that was "sweeping" funds from the accounts of Parker Card cardholders. Tr. at 229-31.

Parker's financial circumstances prompted Patriot to take certain steps that precipitated this action. On April 30, 2026, Patriot notified Parker that the balance in the Collateral Account was

---

[7] On or about May 1, 2026, Parker transferred $2.82 million from one of its accounts at SVB to one of its accounts at Patriot. See PX 14. The recipient account was not the Collateral Account required to be funded under the RSA but, rather, an "operating account" out of which Parker disbursed payroll and other expenditures. See Tr. at 257. On May 1, 2026, Patriot "swept" all of the funds in Parker's accounts at Patriot because of Parker's alleged default under the RSA and PMA. Id. at 257-58. However, Patriot's chief financial officer testified that Patriot had not, as of the date of the preliminary injunction hearing, decided how to allocate the swept funds. Id. at 258-60.

insufficient to pay for the receivables associated with charges incurred from April 22, 2026, to April 24, 2026. DX 8. On May 2, 2026, Parker's general counsel informed one of Parker's technology vendors, Lithic, Inc., that Parker was "in negotiations" with Patriot, SVB, and other parties regarding "the mechanisms and potential limits for ongoing card issuances and transaction authorizations under our program." PX 15 at 5. Upon receiving a copy of Parker's communication to Lithic, a senior vice president at Patriot demanded, at 6:26 a.m. on May 3, 2026, that Parker instruct Lithic "that all instructions given by Patriot [B]ank in relations to the Parker program should be followed." Id. Then, at 9:45 a.m., the senior vice president threatened that, if Parker did not so instruct Lithic, Patriot "will be terminating the program and pursue legal remedies." Id. at 4. At 9:48 a.m., Patriot's general counsel, Jeremy Turk, issued a further threat to Parker: "To be clear, any use of Patriot funds or extension of Patriot credit related to any Parker program in excess of the prescribed limits . . . or in any amount . . . would be unlawful, civilly and potentially criminally, and Patriot will enforce its legal rights and remedies against any party that acts without Patriot's express authority." Id. at 3.[8] Turk repeated his threats in another

---

[8] As the Court discusses below, this May 3, 2026, email contains the first of several threats that Turk made against Parker, Carmel, and other entities. As the Court observed at the preliminary injunction hearing, see Tr. 77-78, 117-18, 198-200, 208-11, while Patriot had the right to pursue all legal remedies available to it, Turk's wholly unfounded threats of "potential" criminal liability in regard to this patently civil dispute were intemperate and inappropriate. Every lawyer, including a lawyer serving as a corporate general counsel, is "an officer of the legal system and a public citizen having special

email at 11:12 a.m.: "We will hold every party acting in contravention of our instructions fully accountable, civilly and potentially criminally." Id. at 1.

In the ensuing days, Patriot contacted both SVB and Carmel. To Lepire, Turk wrote that Patriot considered all receivables originated on or after April 21, 2026, to be its property and that "any attempt by SVB or anyone else to interfere with Patriot's ownership" of those receivables "will be treated as an illegal conversion of such funds." PX 16 at 1; DX 16 at 1. Accordingly, Turk demanded that SVB "render an accounting of the Patriot Receivables and immediately effectuate the transmission" of "an amount equal to the total Patriot Receivables." PX 16 at 1. Turk threatened to bring litigation against SVB and instructed SVB to preserve documents in anticipation of such litigation. See id. at 1-2.

As to Carmel, Patriot initially sought to retain it as a backup servicer for the receivables that Patriot claimed it owned. See Tr. 177-79. On May 7, 2026, Turk wrote to Carmel, informing it that "SVB's purported authority to engage Carmel to service loans originated under the [Parker Card] Program is disputed" and that Patriot's view was that "SVB had and has no authority" to "engage Carmel to service loans owned by Patriot." PX 21 at 1. Turk threatened that, unless Carmel

---

responsibility for the quality of justice." Conn. R. Prof. Conduct, Preamble (2025). In every professional setting, "[a] lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others." Id. As specifically relevant here, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person." Id., R. 4.4(a).

ceased "making any contact to Patriot Loan borrowers relating to Patriot Loans, illegally directing payments to be made by Patriot Loan Borrowers to any account not approved by Patriot in writing," or disbursing any loan proceeds, Patriot would seek to hold Carmel liable. Id. at 2. Moreover, Turk characterized as "clear fraud" SVB's position that it owned or held a security interest in receivables originated on or after April 21, 2026, and he warned Carmel that it "should not participate in any such fraud." Id. at 3. Turk demanded that Carmel provide "written confirmation of full compliance" with Patriot's demands by 3:00 p.m. the same day. Id. at 4.

Because "Carmel, despite being a backup servicer across [SVB's] portfolio in many instances, was hesitant to step into the successor servicer role in this deal, out of fear of the litigation risk with Patriot Bank," SVB had not been able, as of the date of the preliminary injunction hearing, to execute a servicing agreement with Carmel. Tr. at 59-60; see also id. at 122-23; PX 20.[9] But Lepire testified that he expected such an agreement to be consummated soon, and SVB's post-hearing brief contained no contrary representation. See Tr. at 59-60; ECF No. 29.

_____

[9] On May 7, 2026, Turk also sent a demand letter to Parker. PX 25. While not material to the issues presently before the Court, Turk's letter to Parker identified certain purported discrepancies in Parker's books and records; demanded that Parker cease relying on its own records and put SVB, Carmel, and others on notice of the discrepancies; demanded the production of various Parker documents; and informed Parker of Patriot's position that, until Patriot identified a "successor servicer" for the receivables over which Patriot claimed ownership, "no party is authorized to service [those receivables] without Patriot's express prior written consent." Id.

13

Patriot also communicated with Parker Card customers. On or about May 5, 2026, Steven Canup, executive vice president at Patriot, wrote to cardholders that, "[a]s a result of Parker's shutdown, cards issued under Parker's program are not active or usable for new charges." PX 17 at 1; see Tr. at 170-71, 191-92. Canup added that Patriot "understands that this is likely unexpected news" and "welcome[s] the opportunity to answer your questions, discuss your outstanding loans, and to assist you with any treasury management or other banking needs you may have." PX 17 at 1. Carmel personnel became aware of Canup's communication and forwarded a social media post about it to Lepire. PX 19 at 2; Tr. at 69-70. Lepire testified that he worried Canup's communication "would sow confusion with Parker's customers which would be really difficult to unwind." Tr. at 70.

On May 5, 2026, counsel for SVB replied to the letter that Turk had sent to Lepire. PX 18. Counsel explained why SVB regarded Patriot's positions as meritless; demanded that Patriot "immediately cease and desist from taking, or attempting to take, any action whatsoever" with respect to the disputed receivables; and threatened litigation in the event of Patriot's noncompliance. Id. at 2-3. As mentioned above, SVB initiated this action two days later, on May 7, 2026. See Compl.

## II. Analysis

To obtain a preliminary injunction, the moving party "must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an

14

injunction is in the public interest." E.g., New York v. U.S. Dep't of Educ., 477 F. Supp. 3d 279, 293 (S.D.N.Y. 2020).[10] A preliminary injunction is an "extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).

SVB seeks preliminary injunctive relief with respect to both its claim for breach of contract (Count One) and its claim for tortious interference with contract (Count Three). The Court analyzes each count in turn. At bottom, the Court concludes that SVB has failed to show that it faces irreparable harm from the denial of preliminary injunctive relief on its claim for breach of contract, as well as that SVB is unlikely to succeed on the merits of its claim for tortious interference with contract. In light of those conclusions, the Court declines to reach any other preliminary injunction factor with respect to either claim.

A.    Breach of Contract

It is undisputed that both claims as to which SVB seeks preliminary injunctive relief arise under New York law. See ECF No. 8 at 9; ECF No. 18 at 10. In New York, the elements of a claim for breach of contract are (1) the existence of a contract, (2) the plaintiff's performance of its obligations under that contract, (3) the defendants' breach of its obligations under the contract, and

---

[10] Patriot argues, however, that because the preliminary injunction that SVB has requested would alter the status quo, SVB must show "a clear or substantial likelihood of success." See N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d 32, 37 (2d Cir. 2018). Because, however, the Court concludes that SVB has failed to meet the ordinary standard to obtain preliminary injunctive relief, it need not decide whether Patriot is correct that a heightened standard applies.

(4) damages. E.g., Dean Builders Grp., P.C. v. M.B. Din Constr., Inc., 186 A.D.3d 1612, 1614 (2d Dep't 2020).

Here, SVB contends that Patriot breached both the RSA and the PMA. As to the former, SVB alleges that Patriot breached the RSA by asserting ownership over certain receivables that SVB claims Parker purchased from Patriot. See Compl. ¶¶ 40-42. As to the latter, SVB alleges that Patriot breached the PMA by improperly communicating with cardholders in connection with the termination of Parker's operations. See id. ¶¶ 43-44.

A substantial majority of the evidence presented at the preliminary injunction hearing concerned the interpretation of the RSA and PMA. However, the Court need not (and does not) resolve the parties' numerous disputes concerning the meaning of either agreement because SVB has not shown that it faces irreparable harm unless a preliminary injunction were to issue.

SVB primarily argues that it faces irreparable harm from Patriot's alleged misconduct in reference to the RSA and PMA because there is a risk of "permanent, unquantifiable destruction of customer relationships and goodwill that form the very basis of SVB's collateral." ECF No. 8 at 14; see also ECF No. 29 at 2-4.[11] According to SVB, Patriot's communications with cardholders have risked diverting payments and disrupting business relationships, while Patriot's attempts to service accounts have risked confusion on the

---

[11] The Court notes that SVB failed to make arguments with respect to irreparable harm in its pre-hearing brief. See generally ECF No. 26.

part of cardholders. ECF No. 29 at 2-3; see also Tr. at 69-73. Moreover, SVB asserts, Patriot's conduct has imperiled the continued functioning of the Parker Card program, such that the cardholder payments that are continuing to accumulate despite Parker's bankruptcy "cannot be consistently processed and accounted for." ECF No. 29 at 4.

The Second Circuit has held that irreparable harm can take the form of "the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." Ticor Title Ins. Co. v. Cohen, 173 F.3d 63, 69 (2d Cir. 1999); see also Jacobson & Co., Inc. v. Armstrong Cork Co., 548 F.2d 438, 444-45 (2d Cir. 1977). In cases where "the loss of a product will cause the destruction of a business itself or indeterminate losses in other business," the Second Circuit has observed that the recovery of money damages "may be a hollow promise." Tom Doherty Assocs., Inc. v. Saban Ent., Inc., 60 F.3d 27, 38 (2d Cir. 1995).

But SVB's assertions of irreparable harm fail because it has made no showing that SVB, as opposed to Patriot or Parker, has any cardholder goodwill to lose. The evidence at the preliminary injunction hearing demonstrated to the Court's satisfaction that participants in the Parker Card program understood Parker to be the provider of their charge cards and that some participants may have also understood that Patriot was the bank that issued their cards. See Tr. at 130-32, 148-54. To the extent that SVB's argument is that goodwill between cardholders and Parker is at risk should the Court not issue a preliminary injunction, Parker plainly destroyed any good will that

17

it had with its customers by unexpectedly firing its employees, going out of business, and directing customers to contact Patriot and SVB. See ECF No. 27 at 3. To the extent that SVB's argument is that goodwill between cardholders and itself is at risk, no evidence at the preliminary injunction hearing showed that cardholders were aware that SVB was an assignee of Parker's under the agreements at issue in this case or that cardholders had any contact with SVB until, at the earliest, May 3, 2026. See Tr. at 130-32, 148-54.

SVB's reliance on Tom Doherty Associates is unavailing because, in that case, the Second Circuit held that "irreparable harm exists" in the commercial context "only where there is a threatened imminent loss that will be very difficult to quantify at trial." 60 F.3d at 38. Accordingly, the Circuit identified the "governing principle" that, where "the availability of a product is essential to the life of the business or increases business of the plaintiff beyond sales of that product," then "the damage caused by loss of the product will be far more difficult to quantify than where sales of one of many products is the sole loss." Id. Here, SVB has brought forward no evidence that the ongoing viability of the Parker Card program "is essential to the life of [its] business" or that the Parker Card program attracted other business to SVB. See id. Hence, the Court cannot conclude that the difficulties that SVB has encountered with respect to the administration of the Parker Card program after Parker's bankruptcy will cause either "the destruction of [SVB's] business itself" or "indeterminate losses in [SVB's] other business." See id.

18

Thus, SVB has not established that it faces irreparable harm from Patriot's alleged breaches of the RSA and PMA.[12] That does not mean, of course, that SVB will be unable to ultimately succeed in showing that Patriot breached either or both agreements or that SVB was damaged as a result. At this juncture, however, SVB is not entitled to the "extraordinary remedy" of a preliminary injunction. See Winter, 555 U.S. at 24.[13]

B.    Tortious Interference with Contract

In New York, the elements of a claim for tortious interference with contract are (1) the existence of a contract between the plaintiff and a third party, (2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of a third party to breach the contract, and (4) damages. E.g., Hersh v. Cohen, 131 A.D.3d 1117,

---

[12] SVB devotes the opening portion of its post-hearing brief to the argument that, had it not been for the voluntary agreements that the parties reached at the May 13, 2026, hearing that the Court held on SVB's motion for a temporary restraining order, Patriot would have continued to threaten Carmel and others. ECF No. 29 at 1-2. According to SVB, "[t]here can be no question [that] Patriot's conduct will resume without a preliminary injunction." Id. at 2. While the Court concluded, for the reasons stated herein, that SVB has faced no irreparable as of the date of the preliminary injunction hearing, the Court's decision is without prejudice to SVB's capacity to move again for preliminary injunctive relief should circumstances change.

[13] The irreparable harm factor focuses on harm to SVB, as the party seeking preliminary injunctive relief, not on harm to Patriot. The Court takes note, however, of the unrebutted testimony of Patriot's chief financial officer that the issuance of a preliminary injunction could disrupt Patriot's continued "participation in the Mastercard network" because an injunction prohibiting Patriot from "contacting, interfacing, [or] servicing our customers" could subject Patriot to penalties under Mastercard's rules. See Tr. at 238, 262. Any such risk to Patriot would have been part of the Court's balancing of the equities in this case, had such balancing been required.

1119 (2d Dep't 2015). It is well established that a claim for tortious interference with contract requires that the third party actually breach its contract with the plaintiff; that is, it is not enough if the defendant merely attempts to induce breach but does not succeed. The New York Court of Appeals has "repeatedly linked availability of the remedy" of a claim for tortious interference "with a breach of contract." NBT Bancorp v. Fleet/Norstar Fin. Grp., 87 N.Y.2d 614, 620-21 (1996); see also, e.g., Lama Holding Co. v. Smith Barney, Inc., 88 N.Y.2d 413, 424-25 (1996).

SVB alleges that that Patriot has tortiously interfered with two contracts to which SVB is a party, namely, the LSA and the BSA. But SVB is unlikely to succeed in showing that Patriot has tortiously interfered with either contract. As to the LSA, SVB has not alleged that Patriot induced -- or even attempted to induce -- any party to breach that agreement. While Patriot has asserted that certain receivables "were never sold," demanded an accounting and transfer of funds, threatened to sue SVB, and communicated with cardholders, see Compl. ¶ 54, none of these activities amounts to an attempted inducement -- let alone a successful inducement -- of breach with respect to the LSA. Tellingly, in none of its papers has SVB identified any specific provision of the LSA whose breach Patriot induced or even attempted to induce. See generally ECF Nos. 8, 26, 30.

As to the BSA, SVB alleges that Patriot attempted to induce Carmel to breach that agreement. See Compl. ¶ 55. Specifically, SVB alleges that Patriot sought to engage Carmel to service the disputed

receivables, "pressed Carmel to enter into a separate servicing arrangement outside the BSA," and threatened Carmel with litigation. Id. As noted above, the Court has concerns about the conduct of Patriot's in-house counsel, Jeremy Turk, including the excessive threats that Turk made and the highly intemperate tone that he employed in corresponding with Carmel, SVB, and others. See supra n.7. But while the Court in no way condones Turk's conduct, SVB has not alleged that Patriot succeeded thereby in any attempt it made to induce Carmel to breach the BSA. Indeed, no evidence at the preliminary injunction hearing established that Carmel acceded to Patriot's threats, only that those threats may have somewhat delayed the execution of a servicing agreement between SVB and Carmel. See Tr. at 59-60. Thus, because SVB has not established that any party to the BSA actually breached that agreement, it is unlikely to succeed on its tortious interference claim. See NBT Bancorp, 87 N.Y.2d at 620.

Because the Court concludes that SVB is unlikely to succeed on the merits of Count Three, the Court need not (and does not) decide whether SVB has satisfied any of the remaining factors for preliminary injunctive relief.

III. Conclusion

For all the foregoing reasons, the Court issued its May 21, 2026, bottom-line Order denying SVB's motion for a preliminary injunction.

Dated:    New York, NY
          June 9 , 2026                    _____
                                           JED S. RAKOFF, U.S.D.J.

21