UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FIRST-CITIZENS BANK & TRUST COMPANY, AS ADMINISTRATIVE AGENT, d/b/a SILICON VALLEY BANK,

Plaintiff,

v.

PATRIOT BANK, N.A.,

Defendant.

PATRIOT BANK, N.A.,

Counter-Plaintiff and Third Party Plaintiff,

v.

FIRST-CITIZENS BANK & TRUST COMPANY, AS ADMINISTRATIVE AGENT, d/b/a SILICON VALLEY BANK, CARMEL SOLUTIONS LLC, and PARKER WAREHOUSE III LLC,

Counter-Defendant and Third Party Defendants.

26-cv-3810 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.:

On October 13, 2026, the Court entered a "bottom-line" order granting in part and denying in part the motion of defendant Patriot Bank, N.A. ("Patriot"), to dismiss the Amended Complaint. See ECF No. 132. In the same order, the Court also granted in part and denied in part the motion of plaintiff First-Citizens Bank and Trust Company

(hereinafter "SVB")[1] to dismiss Patriot's counterclaims. Id. This Opinion sets forth the reasons for that Order.

## I. Factual Allegations

Because the Court is presented with competing motions to dismiss, each motion must be resolved based on the facts alleged in the relevant pleading. However, the Court begins with the allegations on which the parties agree.

In June 2023, Patriot entered an agreement with non-party Parker Group, Inc. ("Parker Group"), under which the two entities agreed to issue a line of small business charge cards called "Parker Cards." ECF No. 35 ¶¶ 2, 28 (SVB's Amended Complaint, hereinafter "Compl."); ECF No. 42 ¶¶ 12, 66 (Patriot's Counterclaims and Third-Party Complaint, hereinafter "TPC"). As this Court previously described, at a high level, the basic structure of this agreement was that "Patriot, a federally chartered bank and a member of the Mastercard network, would issue the Parker Card, while Parker would service Parker Card customers' accounts." First-Citizens Bank & Tr. Co. v. Patriot Bank, N.A., 834 F. Supp. 3d 462, 465 (S.D.N.Y. 2026) ("SVB I").[2]

### A. Agreements Between Patriot and Parker Group

The agreement between Patriot and Parker Group was governed by two contracts, both of which the parties executed simultaneously on

---

[1] As relevant to this action, First Citizens Bank does business as Silicon Valley Bank.

[2] Except where otherwise indicated, all quotations in this Opinion omit citations, quotation marks, footnotes, brackets, ellipses, and other non-substantive alterations in source material.

June 15, 2023: the Receivables Sale Agreement ("RSA"), see ECF No. 17-1, and the Program Management Agreement ("PMA"), see ECF No. 17-2. Under the RSA, Patriot agreed, during the term of the agreement, to "sell, transfer, assign, set-over, and otherwise convey to" Parker Group "one hundred percent (100%) of the Receivables generated by [Patriot] and funded by" Patriot, including "all monies due or to become due" and "all amounts received with respect to the foregoing." RSA § 2(a). For its part, Parker Group agreed to "purchase all of [Patriot's] right, title, and interest in and to" the Parker Card receivables and to "pay to [Patriot] the Purchase Price on each Closing Date." Id.

On each relevant closing date, Parker Group would "prepare and deliver to" Patriot a written statement identifying the Parker Card receivables that Patriot was selling to Parker Group on that date. Id. § 2(b). That same day, Parker Group would pay the purchase price for those receivables "by wire or other transfer in immediately available funds to an account designated by" Patriot. Id. After each closing date, Parker Group would "be the sole owner for all purposes . . . of the Purchased receivables purchased from [Patriot] on such date." Id. § 3(b). The RSA characterized these transactions as follows: "The Parties hereto intend that the conveyance of [Patriot's] right, title, and interest in and to the Purchased Receivables and the other

Purchased Assets shall constitute an absolute and irrevocable sale and not a secured borrowing."[3] Id. § 3(c).

Finally, the RSA also provided that Parker Group was required to maintain a collateral account with Patriot Bank equal to three times the average daily activity of the Parker Card program. See id. § 35(a), Sched. 1, (nn). Patriot and Parker Group amended the RSA in February 2026, to, among other things, change the required collateral balance to $600,000. See Compl. ¶ 43; TPC ¶ 107.

Turning to the PMA, as this Court previously explained the agreement "sets forth the parties' respective spheres of responsibility for the administration of the Parker Card program." SVB I, at 466. "Under the PMA, Parker is responsible for marketing the program and servicing loan accounts, while Patriot is responsible for establishing loan accounts, obtaining certain regulatory approvals, and maintaining its membership in the Mastercard network." Id.; see PMA §§ 2-5, 7, 9. Relevant here, the PMA also provides that "[i]n no event shall a Party make any public statement or customer communication regarding the termination or wind-down of this Agreement or the Program without the express prior written approval of the other Party." PMA § 14(g).

[3] The RSA also clarifies that, "[i]f despite the parties' full intentions, a specific and final court order . . . rules that the sale of such Purchased Receivables and the other Purchased Assets hereunder shall be treated as a loan rather than an absolute transfer, . . . [Patriot] hereby grants to [Parker Group] a first priority perfected security interest in, to and under all of [Patriot's] right, title and interest" to the receivables discussed above. RSA § 3(c).

Of particular importance to this case, the RSA gave Parker Group the right to assign its "right, title, and interest in, to, and under the Purchased Assets" to a third party. RSA § 38. Such a third party, referred to by the RSA as a "Buyer Assignee," would be "an express third party beneficiary of [the RSA] with the right to enforce it." Id. Likewise, the PMA provided that Parker Group had the right to assign "security interest and lien on all right, title and interest of [Parker] in, to and under [the PMA] and the [RSA] to a purchaser, transferee or assignee of . . . Receivables purchased by Parker under the [RSA]." PMA § 24.

**B. Agreements Between Parker Group, SVB, and Other Entities**

Separate from its agreements with Patriot, in February 2025 Parker Group entered into a financing arrangement with SVB. The structure of this arrangement proceeded as follows. First, Parker Group entered into two agreements — referred to as the "First Step Purchase and Sale Agreement" and the "First Step Omnibus Agreement" — with an affiliate entity called Parker Warehouse III Holdco LLC ("Parker Holdco"). Compl. ¶ 38; TPC ¶ 108. Pursuant to the First Step Agreement, Parker Group assigned its interest in the Parker Card receivables, and its interests in the RSA and PMA, to Parker Holdco. Id. Second, Parker Holdco executed analogous agreements with its subsidiary, third-party defendant Parker Warehouse III LLC ("Parker III"), under which Parker Holdco transferred its interest in the Parker Card receivables and in the RSA and PMA to Parker III. Compl. ¶ 39; TPC ¶¶ 111-12.

Next, Parker III entered a "Loan Servicing Agreement" ("LSA") with SVB, under which Parker III granted SVB a continuing first-priority security interest in the Parker Card receivables. Compl. ¶ 40; TPC ¶ 114-15; see ECF Nos. 11-2 - 11-11 (LSA). In exchange, SVB agreed "as initial Lender to make available to [Parker III] a revolving loan facility in a maximum principal amount up to $100,000,000." LSA, Recitals. Parker III also received access to "a revolving loan facility in a maximum principal amount of $25,000,000" from other lenders. Id.

Finally, Parker Group, Parker III, and third-party defendant Carmel Solutions LLC ("Carmel") entered a "Backup Servicing Agreement," which would appoint Carmel as successor servicer of the Parker Card receivables in the event that Parker was terminated as servicer.[4] Compl. ¶ 46, TPC ¶ 118; see ECF No. 11-13 (BSA). As this Court previously summarized, "the BSA provides that, if Parker becomes unable to continue servicing Parker Card receivables or if another defined event of default occurs, SVB may terminate Parker's servicing responsibilities and appoint a successor servicer." SVB I, at 467; see BSA §§ 4.1-4.2. The parties executed the BSA in February 2025 and amended and restated the BSA in February 2026. Compl. ¶¶ 46-47, TPC ¶ 114.

---

[4] There has arisen some dispute about the distinction between Carmel Solutions LLC, which is a party to this case, and Carmel Servicing LLC, which is not. See ECF Nos. 116-22, 126-28, 130, 133. Any such distinction is not material to the instant motions to dismiss, and the Court does not, in this Opinion, express any view on the matter.

**C. Parker Group's Insolvency**

The Parker Card program operated as generally outlined above for over two years until Parker Group's financial condition deteriorated, and, on May 7, it filed for bankruptcy. See In re Parker Grp., Inc., No. 26-10694 (Bankr. D. Del.). There is some dispute about exactly what happened in the weeks leading up to, and immediately following, Parker Group's default. For purposes of describing the background to the instant action, the Court recites the parties' relevant allegations. When analyzing the competing motions to dismiss, the Court will, of course, "assume[] the truth of the non-conclusory allegations in the" pleading of the non-moving party. Doe v. Bank of Am., N.A., 819 F. Supp. 3d 314, 320 (S.D.N.Y. 2026).

According to Patriot, on April 30, 2026, Parker failed to make its regularly scheduled payment for the previous week's Parker Card receivables. TPC ¶¶ 132-33. This payment would have been for receivables originating on or after April 21, which amounted to roughly $21.5 million dollars. Id. ¶¶ 132-33, 187. Thus, according to Patriot, those receivables remained Patriot's property.

SVB tells a different story. It alleges that under the RSA and PMA, "conveyance of receivables from Patriot to Parker Group was unconditional and not dependent on affirmative payments from Parker Group to Patriot." Compl. ¶ 29. Thus, Patriot had no right to the Parker Card receivables generated on or after April 21.[5] Rather, like

[5] SVB also alleges that Parker Group effectively made some partial payments before it filed for bankruptcy. On May 1, Patriot "swept approximately $5.5 million from Parker Group's accounts at Patriot,"

any other receivables generated through the Parker Card program, these receivables were automatically conveyed to Parker Group and then were transferred to Parker Holdco and ultimately to Parker III. And, like any other receivable, SVB held a perfected first priority security interest in these receivables.

As a result, beginning in early May, SVB and Patriot began asserting competing claims over the $21.5 million in receivables generated on or after April 21. SVB alleges that it delivered a notice of default to Parker Group on May 3, 2026, and delivered a servicing commencement notice to Carmel on May 5. Compl. ¶¶ 49-50. For its part, Patriot on May 4, 2026, sent a letter to SVB asserting that Parker Group had not purchased any receivable originated since April 21, 2026; asserting that receivables originating on or after April 21, 2026, are Patriot's property; and demanding, among other things, an accounting and remittance of the relevant funds. See Compl. 56-57; TPC ¶ 151.

On May 5, 2026, Patriot told cardholders that the Parker Card program had been terminated and that "cards issued under Parker's program were not active or usable for new charges." Compl. ¶ 62. Thereafter, the parties sent competing messages to cardholders and made competing attempts to access funds generated by the disputed receivables. See Compl. ¶¶ 64-65; TPC ¶¶ 164-86.

---

which "constituted payment by Parker Group to Patriot in connection with the Purchased Receivables." Compl. ¶ 52. SVB also alleges that on May 1, Parker Group sent Patriot $2.82 million "as a payment for purchased receivables." Id. ¶ 51.

## II. Procedural History

SVB filed the instant action on May 7, 2026,[6] see ECF No. 1, and filed its amended complaint on June 7, see Compl. SVB asserted six claims in the amended complaint: (1) breach of contract of the RSA and PMA; (2) declaratory judgment establishing SVB's valid, perfected, continuing, first-priority security interest in the Parker Cards receivables; (3) conversion, based on Patriot's actions directing cardholder payments to Patriot; (4) violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), based principally on Patriot's alleged misrepresentations to Parker Cardholders and Carmel; (5) violation of the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"), based on similar allegations; and (6) violation of California's Unfair Competition Law ("UCL"). Compl. ¶¶ 85-140.

On June 30, Patriot filed a motion to dismiss the amended complaint, see ECF No. 40, answered SVB's complaint, and filed its own third party complaint and counter claims against SVB, Parker III, and Carmel, see ECF No. 42. Patriot asserted ten claims against SVB: (1) unjust enrichment; (2) conversion; (3) constructive trust; (4) tortious interference with business relations; (5) tortious interference with contract; (6) accounting; (7) declaratory judgment; (8) aiding and abetting fraud; (9) violation of New York General

[6] Upon filing, SVB sought a temporary restraining order and preliminary injunction. This Court denied the motion because it concluded that SVB "failed to show that it faces irreparable harm from the denial of preliminary injunctive relief on its claim for breach of contract, as well as that SVB is unlikely to succeed on the merits of its claim for tortious interference with contract." SVB I, at 470.

Business Law § 349; (10) violation of the Computer Fraud and Abuse Act ("CFAA"). See TPC ¶¶ 195-346. Patriot also brings eight additional claims against Carmel and Parker III: (1) tortious interference with contract against Carmel; (2) tortious interference with business relations against Carmel and Parker III; (3) aiding and abetting conversion against Carmel and Parker III; (4) aiding and abetting fraud against Parker III; (5) constructive trust against Parker III; (6) unjust enrichment against Parker III; (7) accounting against Parker III; (8) violation of the CFAA against Carmel and Parker III. See TPC ¶¶ 347-466.

On July 27, SVB moved to dismiss Patriot's counterclaims. See ECF No. 74. The Court ruled on the competing motions to dismiss on October 9. See ECF No. 132. The Court dismissed Counts Two through Six of SVB's amended complaint and dismissed Count One of the amended complaint, except insofar as it relates to Parker Card receivables generated prior to April 21, 2026. The Court also dismissed Counts One, Three, Four, Five, Six, Eight, Nine, and Ten brought by Patriot against SVB. The Court also dismissed Patriot's Count Two except insofar as it relates to SVB's role in the alleged concealment of Parker Group's insolvency from Patriot. Finally, the Court left Count Seven of Patriot's counterclaims against SVB fully intact. The analysis that follows explains the reasoning for those rulings.

**III. Legal Standard**

To survive Patriot's motion to dismiss under Fed. R. Civ. P. 12(b)(6), SVB's amended complaint "must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. To survive SVB's motion to dismiss its counterclaims, Patriot's pleading must satisfy the same standard.

Relevant here, "[a] pleading is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." Bank of Am., 819 F. Supp. 3d at 326. For purposes of the instant motions, the Court may consider the contracts between Parker Group and Patriot (RSA and PMA), as well as the various contracts executed by the Parker entities and SVB.

## IV. Analysis

### A. Patriot's Motion to Dismiss SVB's Amended Complaint

The Court begins by considering Patriot's motion to dismiss SVB's amended complaint. Before taking each claim in turn, the Court first addresses two threshold issues relevant to the resolution of many of SVB's claims. First, as explained further below, the Court concludes that SVB holds a perfected first-priority security interest in Parker Card receivables that were conveyed to Parker Group and therefore has standing a third-party beneficiary to enforce the RSA and PMA with respect to those receivables. Second, the Court concludes that, as a matter of the unambiguous language of the RSA and PMA, Patriot is the owner of receivables for which Parker Group did not make payments.

**i. Ownership of the Disputed Receivables**

The series of contracts described above, see supra §§ I.A-B, amount to the following chain of ownership: Parker Card receivables were generated by Patriot, conveyed to Parker Group, and then transferred down the line to Parker Holdco and ultimately Parker III. Then, under the LSA between Parker III and SVB, Parker III granted SVB a continuing first-priority security interest in the Parker Card receivables. See supra § I.B.

Thus, at the heart of this case, beneath the great morass of competing allegations, lies an essential question: were the Parker Card receivables generated on or after April 21, 2026, conveyed from Patriot to Parker Group? If they were, then, like receivables generated earlier, they were subject to the foregoing chain of transfer. If they were not, then SVB could have no plausible claim to them. The Court therefore begins its analysis with this central question.

SVB's position is that Patriot conveyed Parker Card receivables to Parker Group automatically and without requiring payment as a precondition. The Court disagrees.

To begin, the plain terms of the RSA contemplate a sale of the Parker Card receivables from Patriot to Parker Group. Section 2 of the RSA provides that Patriot agreed to "sell, transfer, assign, set-over, and otherwise convey" all relevant receivables to Parker, "in consideration" for which Parker agreed "to purchase all of [Patriot's] right, title and interest in and to such receivables, and [Parker] shall pay to [Patriot] the Purchase Price on each Closing Date." RSA

§ 2(a) (emphasis added). The RSA then provides that Parker "shall make payment to [Patriot] of the Purchase Price" and that each daily payment "shall be made by wire or other transfer." Id. § 2(b) (emphasis added). Later, the RSA refers to the conveyance of receivables as "an absolute and irrevocable sale," and refers generally to the RSA as a "Sale Agreement." Id. §§ 3(b), 9(c). And finally, the RSA provides that Patriot may terminate the agreement if, among other things, Parker "defaults on its obligation to make a payment . . . and fails to cure such default." Id. § 10(c).

In other words, nothing in the text of the RSA supports SVB's theory of unconditional conveyance. Rather, the RSA plainly provided for the periodic purchase of Parker Card receivables by Parker Group from Patriot. More plainly: no payment, no purchase; no purchase, no conveyance.

SVB argues that RSA contains no conditions precedent to conveyance of receivables from Patriot to Parker. Instead, the RSA sets up two separate covenants. One, established by § 2(a), is an unconditional transfer of receivables from Patriot to Parker Group. The second, established by § 2(b), is an obligation by Parker Group to pay Patriot. And the sole recourse available to Patriot in the event that Parker failed to meet its obligation to pay, as provided by §§ 2(c) and 35, was to withdraw compensation from the collateral account. See ECF No. 53, at 16.

The Court declines to adopt such a piecemeal reading of the RSA. "Because contract interpretation is an exercise in common sense rather

than formalistic literalism, words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby." RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V., 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014). Section 2 as a whole refers to the purchase of receivables and sets out the mutual obligations of each party. Further, § 3(b) defines the receivables that Parker Group owned as those that it "purchased from [Patriot]." And, quite expressly, § 9(c) provides that satisfaction of Parker Group's obligations – among which is the obligation to pay – was a condition precedent to Patriot's obligations. The Court therefore rejects SVB's attempt to slice the RSA into multiple isolated covenants.

Beyond the foregoing text of the RSA, SVB argues that Patriot and Parker Group developed a course of dealing – later formalized in an amendment to the RSA – that transformed what may have previously been a sale of receivables into "an interest-bearing credit facility." ECF No. 53, at 16; see Compl. ¶¶ 31, 42-44. As before, this argument is contradicted by the plain terms of the RSA. Indeed, the RSA expressly provides that the transaction between the parties was "not a secured borrowing" and only a "specific and final court order" could deem it such. RSA § 3(c).

Finally, SVB alleges that Patriot swept more than $5 million from Parker Group's accounts with Patriot. SVB argues that this shows Patriot's remedy for non-payment was to the collateral account and not to the receivables. This, too, is unavailing. Whatever the propriety

of Patriot's alleged sweep of Parker Group's accounts, this allegation does not alter the terms of the RSA.

In sum, the Court concludes that, under the RSA, conveyance of Parker Card receivables from Patriot to Parker Group was contingent on, among other things, payment of the purchase price as defined by the RSA. The Court now turns to SVB's claims against Patriot.

**ii. Count One: Breach of Contract**

SVB alleges that Patriot's assertion of ownership over the receivables generated on or after April 21, as well as certain actions with respect to earlier-generated receivables, constitute a breach of the RSA and PMA. Before turning to the merits of this claim, the Court begins by determining whether SVB, as a non-party to the RSA and PMA, has standing to sue for breach of these agreements.

Under § 38 of the RSA, Patriot agreed "that all of the [Parker Group's] right, title, and interest in, to, and under this Agreement, including all of the Buyer's right, title, and interest in, to and under the Purchased Assets, may be assigned by [Parker Group] to a Buyer Assignee, and [Patriot] consents to such assignment." Further, § 38 provided that "each Buyer Assignee shall be an express third-party beneficiary of this Agreement with the right to enforce it." Id. Thus, to the extent SVB is a "Buyer Assignee," the RSA expressly provides it with a right to enforce the agreement.

The RSA defines a Buyer Assignee as a "direct or indirect assignee of [Parker Group] that then owns Purchased Receivables and/or has been collaterally assigned to otherwise pledged or granted a security

interest in [Parker Group's] rights and interests in, to and under all or any portion of the Purchased Receivables and/or other Purchased Assets purchased by [Parker Group] from [Patriot] under this Agreement and the related Purchased Assets and [Parker Group's] rights." RSA Sched. 1(j). Accordingly, there are two ways that SVB could be a Buyer Assignee under the RSA. It could either (1) own Parker Card receivables, or (2) have been granted a security interest in some portion of the Parker Card receivables.

SVB takes the second route. As discussed, SVB does not claim to own Parker Card receivables. Rather, it alleges – and the relevant contracts reflect – that it holds a perfected first-priority security interest in the receivables, which was granted by Parker III under the LSA. Thus, the Court concludes that SVB is a "Buyer Assignee" under the RSA and therefore has standing to enforce the contract.[7]

That said, SVB's rights under the RSA and PMA depend upon an assignment chain that begins with the conveyance of Parker Card receivables from Patriot to Parker Group. Put differently, SVB's right to enforce the RSA and PMA extend only to the receivables that were conveyed – or should have been conveyed – to Parker Group from Patriot. And as explained above, under the RSA, conveyance of the receivables was contingent on, among other things, payment of the purchase price.

SVB has not alleged that Parker Group paid the purchase price for Parker Card receivables generated on or after April 21, 2026. To the

[7] For substantially the same reason, SVB is an express third-party beneficiary of the PMA with rights to enforce that contract as well. See PMA § 24.

contrary, as discussed above, SVB's principal theory with respect to these receivables, which the Court has already rejected, is that the RSA provided for automatic and unconditional transfer. While SVB alleges that some money was transferred from Parker Group to Patriot in early May, 2026, see Compl. ¶¶ 51-52, it does not allege even in conclusory fashion that Parker Group paid the required purchase price for the disputed receivables, or that it satisfied any of the other conditions precedent to conveyance under the RSA. Accordingly, the Court concludes that SVB has failed to state a claim for breach of contract with respect to any of the receivables generated on or after April 21, 2026.

However, the amended complaint also contains at least one allegation that relates to Parker Card receivables generated prior to April 21, 2026. Namely, SVB alleges that during the week of May 13, 2026, "Patriot instructed Customer A to wire $1,024,127.78 to Patriot . . . in purported satisfaction of an outstanding balance that originated on March 24, 2026." Compl. ¶ 79. SVB further alleges that "[o]n or about May 21, 2026, Customer A made this payment to Patriot." Id. These allegations are different. There is no dispute that Parker Group made payments for receivables generated prior to April 21, 2026. Accordingly, assuming the truth of SVB's allegations, Patriot's attempts to collect money owed on receivables that it conveyed to Parker Group months earlier plainly constitute breach of the RSA and PMA.

In sum, the Court concludes that the amended complaint states a claim for breach of contract insofar as it relates to Parker Card receivables generated prior to April 21, 2026. However, SVB has not alleged any contractual rights to receivables generated on or after that date. Therefore, the Court dismisses Count One in part.

**iii. Count Two: Declaratory Judgment**

SVB seeks a declaratory judgment confirming that Parker III owns all Parker Card receivables, including those generated on or after April 21, 2026, and that SVB holds a perfected first-priority security interest in the same. See Compl. ¶¶ 97-101. Patriot argues that this claim is duplicative of SVB's breach of contract claim and should be dismissed for that reason. The Court agrees.

"A declaratory judgment is appropriate where: (1) the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) a judgment would finalize the controversy and offer relief from uncertainty." Jujamcyn Theaters LLC v. Fed. Ins. Co., 659 F. Supp. 3d 372. 383 (S.D.N.Y. 2023). SVB argues it needs a declaratory judgment to address Patriot's ongoing assertion of rights to the disputed receivables and not just backward-looking harms. ECF No. 53, at 20-21. But the Court agrees with Patriot that SVB's requested declaratory judgment is essentially indistinguishable from the relief it would obtain through its breach of contract claim. See Compl. ¶ 101. Indeed, the Court has now clarified — when analyzing SVB's breach of contract claim — that SVB holds rights to receivables actually purchased by Parker Group from Patriot and not to receivables for

which a purchase price was never paid. "Because the claim for declaratory judgment would not clarify any uncertainty in the parties' legal relations that would otherwise remain unresolved as part of the breach of contract claim, declaratory judgment would serve no purpose." Jujamcyn, 659 F. Supp. 3d at 383. Accordingly, the Court dismisses Count Two.

**iv. Count Three: Conversion**

SVB next brings a claim for conversion based on Patriot's attempts to "direct[] cardholder payments to Patriot, and [to] exercis[e] dominion over the proceeds from the Purchased Receivables." Compl. ¶ 105. Patriot argues that, like its declaratory judgment claim, SVB's conversion claim should be dismissed as duplicative of Count One. Again, the Court agrees.

"Generally, a tort cause of action that is based upon the same facts underlying a contract claim will be dismissed as a mere duplication of the contract cause of action." Reade v. SL Green Operating P'ship, LP, 817 N.Y.S.2d 230, 231 (1st Dept. 2006). Even when faced with a potentially meritorious claim, courts have still held that "a plaintiff's claim for conversion cannot merely restate its cause of action to recover damages for breach of contract without alleging a separate taking." Vekaria v. Mthree Corp. Consulting, Ltd., No. 22 CIV. 3197 (JPC), 2024 WL 4337542, at *16 (S.D.N.Y. Sept. 27, 2024). "To determine whether a conversion claim is truly distinct from a breach of contract claim," and therefore must be dismissed, "courts

look both to the material facts upon which each claim is based and to the alleged injuries for which damages are sought." Id.

SVB's conversion claim is essentially duplicative of its breach of contract claim. The right to payment on Parker Card receivables is one of the contractual rights provided by the RSA and PMA. Accordingly, SVB's security interest in the receivables, and payments thereon, arise downstream of those same contractual rights. In other words, SVB has not identified any distinct duty that Patriot allegedly owed to SVB beyond its contractual obligations under the RSA and PMA. Contra Connecticut New York Lighting Co. v. Manos Bus. Mgmt. Co., Inc., 171 A.D.3d 698, 699-700 (2d Dep't 2019) (finding that the plaintiff alleged a distinct conversion claim because the "complaint allege[d] a bailment relationship between the parties"). The Court therefore dismisses Count Three as duplicative of SVB's breach of contract claim.

**v. Count Four: Connecticut Unfair Trade Practices Act**

SVB alleges that Patriot violated the Connecticut Unfair Trade Practice Act ("CUTPA") when it "sent false communications to cardholders about Carmel's authority, diverted Bill Pay funds, and refused to return funds it acknowledged were not owed." ECF No. 53, at 26; see Compl. ¶¶ 18-21, 65, 73-76. Patriot argues, as a threshold matter, that this claim is barred by the New York choice-of-law provision contained in the RSA and PMA. The Court disagrees.

"New York law is clear that a contractual choice of law provision governs only a cause of action sounding in contract, not one sounding in tort, unless the express language of the provision is sufficiently

broad as to encompass the entire relationship between the contracting parties." Aviles v. Wells Fargo Bank, N.A., 2026 WL 1256083, at *4 (2d Cir. May 7, 2026). Here, the RSA provides that construction of the contract would be governed by New York law. RSA ¶ 25; see also PMA § 21. The RSA contains a broader forum-selection provision, which applies to "any right arising out of" the contract. But under New York law, broad forum-selection language does not preclude claims independent of the contract that arise under the laws of other states. As the Second Circuit has explained, "[u]nder New York law, [] tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs construction of the terms of the contract, even when the contract also includes a broader forum-selection clause." Fin. One Pub. Co. v. Lehman Bros. Special Fin., 414 F.3d 325, 335 (2d Cir. 2005). Accordingly, the Court concludes that choice-of-law and forum-selection clauses in the RSA and PMA do not preclude SVB's CUTPA claim.

However, the Court concludes that the amended complaint does not state a CUTPA claim. While "[a] simple breach of contract . . . standing alone, does not offend public policy so as to invoke CUTPA," a party may nonetheless assert a CUTPA claim "where the facts alleged support a claim for more than a mere breach of contract." Greene v. Orsini, 50 Conn. Supp. 312, 314-15 (Super. Ct. 2007). To do so, a plaintiff must allege "aggravating factors [that] constitute more than a failure to deliver on a promise." Id. Among such aggravating factors

are "multiple breaches . . . causing substantial injury to a competing business," and misrepresentations of a party's intentions. Id. at 316.

SVB's allegations primarily concern Patriot's assertion of rights to Parker Card receivables generated on or after April 21, 2026. This is, in substance, a dispute over the meaning of the RSA. While SVB alleges that Patriot took many steps to assert its understanding of the RSA — an understanding that the Court has now largely endorsed — it has not alleged such aggravating circumstances as to offend public policy. And while the Court has concluded that SVB's single allegation concerning pre-April 21 receivables suffices to state a breach of contract claim, it is likewise insufficient to allege aggravating circumstances for purposes of CUTPA. The Court therefore dismisses SVB's CUTPA claim.

**vi. Count Five: North Carolina Unfair and Deceptive Trade Practices Act**

Much of the foregoing analysis applies to SVB's claim under the North Carolina Unfair and Deceptive Trade Practices Act ("NCUDTPA"). For the reasons discussed above, the choice-of-law provision does not foreclose a claim under North Carolina law. However, like CUTPA, "[n]either an intentional breach of contract nor a breach of warranty . . . constitutes a violation" of the NCUDPTA. Izzy Air, LLC v. Triad Aviation, Inc., 284 N.C. App. 655, 661 (2022). To allege an NCUDPTA violation where the underlying issue is a contractual breach, "[s]ubstantial aggravating factors must attend the breach." Id. Here, however, as with the CUTPA claim, any NCUDPTA claim depends upon premise that SVB has plausibly alleged a right to the receivables

generated on or after April 21. For the reasons discussed throughout the Court's Opinion, SVB has not done so. And the single allegation concerning a pre-April 21 receivable is not sufficient to allege substantial aggravating factors. Therefore, the Court dismisses SVB's claim under the NCUDTPA.

**vii. Count Six: California's Unfair Competition Law**

Finally, the Court considers SVB's claim under California's Unfair Competition Law ("CUCL"). The Court dismisses this claim because SVB has not pleaded an adequate nexus to California to state a claim under the CUCL. "State statutory remedies under the CLRA and UCL may be available to non-California residents if those persons are harmed by wrongful conduct occurring in California." In re Toyota Motor Corp., 785 F. Supp. 2d 883 (C.D. Cal. 2011). Here, the sole connection to California is that Customer A, and potentially other cardholders, are California residents. But they are not plaintiffs here, and injury is not alleged on their behalf. Rather, SVB – a North Carolina based bank – is suing Patriot, a Connecticut based bank, based on conduct not alleged to have taken place in California. This is insufficient to state a claim under the CUCL.

**B. SVB's Motion to Dismiss Patriot's Counterclaims Against SVB**

The Court next turns to SVB's motion to dismiss the ten counterclaims Patriot brought against SVB. For the reasons that follow, the motion is granted in part and denied in part.

**i. Count One: Unjust Enrichment**

Patriot first brings a claim for unjust enrichment against SVB. See TPC ¶¶ 195-209. The essence of Patriot's claim is that SVB improperly asserted rights to Parker Card receivables generated on or after April 21, 2026, including by sweeping funds from various accounts held by Parker Group related to the receivables. SVB argues that Patriot's unjust enrichment claim is precluded by the existence of a contractual relationship between the parties. The Court agrees.

"Unjust enrichment claims are available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." Arcadia Biosciences, Inc. v. Vilmorin & Cie, 356 F. Supp. 3d 379, 401 (S.D.N.Y. 2019); see Clark-Fitzpatrick, Inc. v. Long Island R. Co., 70 N.Y.2d 382, 389 (1987). As the Second Circuit recently explained, "[t]hat rule reflects the notion that the parties' own definition of their respective obligations takes precedence over the obligations that the law would impose in the absence of agreement." Northwell Health, Inc. v. Grp. Hospitalization & Med. Servs., Inc., 183 F.4th 78, 100 (2d Cir. 2026). Thus, as a general matter, "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." Arcadia, 356 F. Supp. 3d at 401. And relevant here, "New York state courts and [courts] in this district have consistently held that this is so even if one of the parties to

the lawsuit is not a party to the contract." Ben & Jerry's Homemade, Inc. v. Unilever PLC, 2026 WL 2453722, at *12 (S.D.N.Y. Aug. 21, 2026).

Here, while Patriot and SVB are not signatories to the same contract, SVB is a third-party beneficiary of the RSA and PMA with express rights to enforce the two contracts. Patriot's unjust enrichment claim amounts to the allegation that SVB exercised rights to receivables to which it was not entitled under the RSA. See ECF No. 89, at 9. Thus, while the Court is mindful that New York law does not impose a "categorical rule that a plaintiff's claim is precluded by the existence of an overlapping contract," Northwell Health, 183 F.4th at 101, in this case there exists "a valid written agreement . . . , the scope of which clearly covers the dispute between the parties." Clark-Fitzpatrick, 70 N.Y.2d at 389; cf. W. 63 Empire Assocs., LLC v. Walker & Zanger, Inc., 107 A.D.3d 586, 586-87 (1st Dep't 2013) (finding that a third-party beneficiary was precluded from bringing an unjust enrichment claim arising from the same subject matter as the contract). Therefore, the Court dismisses Patriot's unjust enrichment claim.

**ii. Count Two: Conversion**

Patriot next brings a claim for conversion against SVB. See TPC ¶¶ 210-22. Patriot alleges that SVB improperly swept funds from Parker accounts, directed Carmel and Parker Group to make fraudulent misrepresentations to cardholders, and concealed material facts from Patriot in order to divert payments on receivables to SVB. As the Court discussed when considering SVB's conversion claim, "[a] conversion claim may only succeed if the party alleges a wrong that

is distinct from any contractual obligations." Command Cinema Corp. v. VCA Labs, Inc., 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006). For the same reasons discussed when considering SVB's conversion claim, and when dismissing Patriot's unjust enrichment claim, the Court concludes that Patriot's allegations concerning SVB's attempts to assert rights to the disputed receivables do not state a claim that is distinct from contractual obligations under the RSA and PMA.

However, the Court agrees with Patriot that a narrow slice of the third party complaint plausibly alleges wrongful conduct distinct from any contractual obligations under the RSA and PMA. Patriot alleges that Parker Group intentionally concealed its impending insolvency from Patriot in order to induce Patriot to continue originating receivables for the benefit of Parker Group and SVB — this despite the fact that the RSA and PMA make Parker's continued solvency a condition precedent to Patriot originating and funding receivables. See TPC ¶¶ 292-97. Patriot further alleges that SVB had actual knowledge of Parker's insolvency and that it intentionally concealed that fact from Patriot. Id.

A claim for conversion consists of three elements: "1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the thing in question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F. Supp. 2d 162, 204 (S.D.N.Y.

2011). Patriot alleges that SVB intentionally concealed Parker Group's impending insolvency in order to ensure Patriot would continue generating Parker Card receivables and then, when Parker Group was no longer able to make payments to purchase those receivables, swept funds to which it lacked any contractual entitlement. This course of conduct satisfies the elements of a conversion claim under New York law and, importantly, goes beyond the contractual obligations imposed under the RSA and PMA. Accordingly, the Court denies the motion to dismiss Patriot's conversion claim.

**iii. Count Three: Constructive Trust**

Patriot next brings a claim for constructive trust. "To be entitled to a constructive trust under New York law, a party must establish four elements: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." Winklevoss Cap. Fund, LLC v. Shrem, 351 F. Supp. 3d 710, 720 (S.D.N.Y. 2019). SVB argues that Patriot has failed to allege the threshold element — that there was a confidential or fiduciary relationship between it and Patriot. The Court agrees.

"A fiduciary relationship exists between two [entities] when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." AG Cap. Funding Partners, L.P. v. State St. Bank & Tr. Co., 896 N.E.2d 61, 68 (N.Y. 2008). Patriot has not alleged anything more than a commercial contract between itself and Parker, to which SVB is a third-party

beneficiary. Contrary to Patriot's argument, the existence of a confidentiality clause in the RSA, see RSA § 12, does not create a confidential relationship for purposes of constructive trust. In view of the total absence of any alleged fiduciary or confidential relationship between SVB and Patriot, the Court dismisses Patriot's claim for constructive trust.

**iv. Count Four: Tortious Interference with Business Relations**

Count Four of Patriot's counterclaims against SVB alleges tortious interference with business relations. See TPC ¶¶ 233-42. A claim for tortious interference with prospective business advantage must allege that: "(a) the plaintiff had business relations with a third party; (b) the defendant interfered with those business relations; (c) the defendant acted with the sole purpose of harming the plaintiff or by using unlawful means; and (d) there was resulting injury to the business relationship." Thome v. Alexander & Louisa Calder Found., 70 A.D.3d 88, 108 (1st Dept. 2009). SVB argues that Patriot failed to allege the third and fourth elements. The Court agrees as to the third element and therefore dismisses Count Four.

To state a claim for tortious interference with business relations, Patriot must allege, among other things, that SVB "acted with the sole purpose of harming [Patriot] or by using unlawful means." Id. Because Patriot has not alleged that SVB's sole purpose was to harm Patriot, it must instead show that SVB used unlawful or wrongful means. New York courts have dismissed tortious interference claims where the plaintiff "has not alleged any facts suggesting that

defendants violated the law or undertook actions with the sole purpose of harming him," and instead alleged that "defendants acted with the intent of benefitting themselves." Thome, 70 A.D.3d at 108.

Here, Patriot alleges that SVB made, and directed Carmel to make, false statements to cardholders, and that these false statements constituted wrongful conduct that interfered with its business relationships with cardholders. See TPC ¶¶ 237-40. As SVB points out, these allegations amount to SVB "asserting a contested contractual position" with respect to the disputed receivables – the same position it has zealously argued in the instant action. ECF No. 102, at 7. At most, then, these were "actions taken with the dual intention of harming [Patriot] while benefitting [SVB]," which New York courts have found "are inadequate to plead tortious interference with business relations." Runway Towing Corp. v. Mazzio, 87 Misc. 3d 1219(A), at *10 (N.Y. Sup. Ct. 2025); see also Williams v. Citigroup, Inc., 954 N.Y.S.2d 762, at *6 (Sup. Ct. 2012), aff'd as modified, 962 N.Y.S.2d 96 (1st Dep't 2013).

The Court therefore concludes that Patriot has not alleged wrongful conduct by SVB relating to Patriot's relationships with cardholders.[8] Accordingly, Count Four is dismissed.

---

[8] Patriot argues that its allegations concerning SVB's concealment of Parker Group's impending insolvency constitute wrongful means. See ECF No. 89, at 15. But it is not clear how these statements – allegedly made by Parker Group to Patriot – constituted interference by SVB with Patriot's relationship with Parker Card customers.

**v. Count Five: Tortious Interference with Contract**

Patriot next alleges that SVB tortiously interfered with the Business Card Agreements ("BSA") that it held with Parker Card customers. See TPC ¶¶ 243-54. SVB argues that this claim fails because the BSAs were terminable at will. The Court agrees and therefore dismisses Count Five.

It is well-established under New York law that "a contract terminable at will cannot be the basis for a tortious interference claim." AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., 2003 WL 21203503, at *3 (S.D.N.Y. May 22, 2003) (collecting cases). A contract that is terminable at will may only be the basis for a claim for tortious interference with prospective contractual relations, which requires a showing of wrongful conduct. See Ackerson v. Restani Constr. Corp., 223 N.Y.S.3d 268, 271 (2d Dept. 2024). Thus, a threshold issue here is whether the BSA was terminable at will.

The relevant clause in the BSA provides as follows:

> You may close your Account at any time by contacting us and destroying or returning the cards to us. You will remain responsible for any amounts you owe us under this Agreement and your Account, and this Agreement will not terminate until you pay all that you owe us under this Agreement. We may close, cancel, suspend or not renew your Account at any time without notice and for any reason.

ECF No. 17-12 § 15. Patriot points out that the BSA provides that cardholders were not permitted to terminate the contract until they paid what was owed under the contract. Patriot's allegation is that SVB induced cardholders to withhold payments owed under the agreement, thereby breaching the contract. Accordingly, Patriot argues, the

contract was not at will in the relevant sense. In other words, the contractual obligation with which SVB allegedly interfered was the obligation to make payments on charges that had already been generated, and this was not an obligation that was dischargeable at will.

On SVB's account, the first sentence and the last sentence establish that the contract was terminable at will. The Court agrees. Section 15 clearly provides both parties with the right to terminate at any time and merely specifies that cardholders must make payments for services already provided under the contract when they terminate. Under New York law, such a contract cannot support a claim for tortious interference with contractual relations. See Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 450-51 (N.Y. 1980). The Court therefore dismisses Count Five.[9]

**vi. Count Six: Accounting**

Patriot next brings a claim for accounting. See TPC ¶¶ 255-267. Under New York law, the first element of a claim for equitable accounting is the existence of a fiduciary relationship. Fuller Landau Advisory Servs. Inc. v. Gerber Fin. Inc., 333 F. Supp. 3d 307, 315 (S.D.N.Y. 2018). As the Court has already concluded, Patriot has not alleged any such relationship between itself and SVB. Accordingly, Patriot's claim for equitable accounting is dismissed.

[9] For the reasons discussed as to Count Four, the third-party complaint does not allege that SVB engaged in wrongful conduct with respect to Patriot's relationship with the Parker Card customers. Accordingly, Patriot has not pled tortious interference with prospective contractual relations either. See Ackerson, 223 N.Y.S.3d at 271.

**vii. Count Seven: Declaratory Judgment**

Patriot seeks a declaratory judgment clarifying its "ownership of and entitlement to" the Parker Card receivables originating on or after April 21. See TPC ¶¶ 268-80. SVB principally argues that the declaratory judgment claim is duplicative of its own breach of contract claim, which is Count One of SVB's amended complaint. The Court disagrees.

As discussed elsewhere in this Opinion, "[a] declaratory judgment is appropriate where: (1) the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) a judgment would finalize the controversy and offer relief from uncertainty." Jujamcyn, 659 F. Supp. 3d at 383. The overwhelming majority of the disputes between these parties arise from legal uncertainty as to the ownership of the Parker Card receivables generated on or after April 21, 2026. Plainly, clarifying ownership over the receivables originated would bring an end to a great deal of their controversy and resolve the central legal issue involved.

The Court has now dismissed SVB's breach of contract claim insofar as it relates to post-April 20 receivables. To adopt that holding, the Court reached two conclusions. First, the Court concluded that, as a matter of its plain terms, the RSA required Parker Group to make affirmative payments to Patriot as a condition precedent to Patriot conveying a new tranche of receivables to Parker Group. Second, as a matter of SVB's pleading and arguments, the Court concluded that SVB

has not alleged such payments were made with respect to the post-April 20 receivables.

By contrast, in view of the Court's interpretation of the RSA, Patriot has amply alleged its own right to the disputed receivables. See, e.g., TPC ¶ 273-74 (alleging that Parker Group failed to purchase the disputed receivables on April 30, 2026). Ultimately resolving this claim therefore serves the useful purpose of determining ownership of the receivables. The fact that SVB brought its own breach of contract claim, based on its own set of allegations, does not obviate the utility of Patriot's separate claim for declaratory relief.

The Court denies SVB's motion to dismiss Count Seven.

**viii. Count Eight: Aiding and Abetting Fraud**

The Court next addresses Patriot's aiding and abetting fraud claim. See TPC ¶¶ 281-306. "A plaintiff alleging an aiding-and-abetting fraud claim must allege the existence of the underlying fraud, actual knowledge, and substantial assistance." U.S. Tsubaki Holdings, Inc. v. Estes, 194 A.D.3d 590, 591 (1st Dep't 2021). Because the Court concludes that Patriot has not alleged an underlying fraud claim, the Court dismisses Patriot's claim for aiding abetting fraud.

Fed. R. Civ. P. 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." This rule "requires a plaintiff to adequately specify the statements it claims were false or misleading, give particulars as to the respect in which the plaintiff contends the statements were fraudulent, state when and where the statements were

made, and identify those responsible for the statements." City of Perry, Iowa v. Procter & Gamble Co., 188 F. Supp. 3d 276, 290 (S.D.N.Y. 2016). Patriot's allegations do not meet this standard.

Patriot bases its aiding and abetting claim on the underlying allegation that Parker Group intentionally and fraudulently concealed its deteriorating financial condition in the months leading up to its bankruptcy in May 2026. See TPC ¶¶ 122-26. But Patriot "identifies no specific statements, no specific speakers" and no specific occasions on which it received misrepresentations from Parker. City of Perry, 188 F. Supp. 3d at 290. While Patriot argues that the standards applicable to a fraud claim under Rule 9(b) can be relaxed when the relevant information is within the defendant's control, here, the underlying fraud relates to statements allegedly made by Parker Group to Patriot. The Court sees no reason to relax the 9(b) standard (assuming arguendo that it is ever appropriate to do so) when Patriot should be able to allege with particularity precisely what statements Parker Group made to Patriot concerning its solvency.[10]

In sum, the Court concludes that Patriot failed to allege underlying fraud with sufficient particularity to state a claim for

---

[10] Patriot also alleges generally that Parker Group failed to disclose its financial condition "in spite of its ongoing duty to represent and warrant that it was not Insolvent under the Program Documents." ECF No. 89, at 21. However, as SVB points out, this allegation merely describes a failure to comply with Parker Group's contractual obligations, which is insufficient to state a claim for fraud. See Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 19-20 (2d Cir. 1996).

aiding and abetting fraud against SVB. Therefore, the Court dismisses Count Eight against SVB.

**ix. Count Nine: New York General Business Law § 349**

Patriot next alleges that SVB's statements to Parker Card customers violated N.Y. Gen. Bus. L. § 349. TPC ¶¶ 307-25. To state a claim under § 349, "[a] plaintiff must allege that: (1) the defendant's conduct was consumer-oriented; (2) the defendant's act or practice was deceptive or misleading in a material way; and (3) the plaintiff suffered an injury as a result of the deception." Harbord v. A.J. Richard & Sons, Inc., 249 A.D.3d 703, 704 (2d Dept. 2026). Because Patriot has not alleged consumer-oriented conduct, the Court dismisses Count Nine.

The New York Court of Appeals has explained that, "as a threshold matter, plaintiffs claiming the benefit of section 349 . . . must charge conduct of the defendant that is consumer-oriented." Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995). To satisfy this threshold requirement, a plaintiff must allege "that the acts or practices [complained of] have a broader impact on consumers at large." Id. "Private contract disputes, unique to the parties, for example, would not fall within the ambit of the statute." Id.

The Court of Appeals has recently clarified that "what matters is whether the defendant's allegedly deceptive act or practice is directed to the consuming public and the marketplace." Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co.,

Inc., 171 N.E.3d 1192, 1198 (N.Y. 2021). Put differently, "GBL § 349 is focused on the seller's deception and its subsequent impact on consumer decision-making, not on the consumer's ultimate use of a product." Id.

Patriot's position is that SVB's conduct towards Parker Card customers was consumer-oriented. But as SVB points out, the Parker Card was a small business charge card and therefore was "a commodity available to businesses only." See Cruz v. NYNEX Info. Res., 263 A.D.2d 285, 703 N.Y.S.2d 103 (2000), abrogated on other grounds by Himmelstein, 171 N.E.3d at 1198. Moreover, the alleged consumer-oriented communications are necessarily limited to a closed universe of small-business cardholders whose receivables fall within the ambit of the parties' contractual dispute. The Court fails to see how these communications, which were targeted at a few hundred cardholders, could reasonably be characterized as having been directed at the broader consuming public. Accordingly, Patriot has failed to allege consumer-oriented conduct and Count Nine is therefore dismissed.

**x. Count Ten: Consumer Fraud and Abuse Act**

Patriot alleges that SVB violated the Consumer Fraud and Abuse Act ("CFAA"), see 18 U.S.C. §§ 1030(a)(2), (4)-(5), by accessing Parker's systems to sweep funds and obtain Parker Card customer data, see TPC ¶¶ 326-46. To bring a civil cause of action under the CFAA, a plaintiff must allege that they "suffer[ed] damage or loss by reason of" a CFAA violation. 18 U.S.C. § 1030(g). The Court concludes that

Patriot has not alleged damage or loss within the meaning of the CFAA. Accordingly, the Court dismisses Count Ten against SVB.

Under the CFAA, "the term damage means any impairment to the integrity or availability of data, a program, a system, or information." Id. § 1030(e)(8). As this Court recently explained, "a defendant causes damage within the meaning of the CFAA when the relevant system no longer operates as it did when it first came into the owner's possession and has an unwanted characteristic, which, if known, would negatively impact the economic value of the computer system, unless time and money are expended to remove it." United States v. Spalletta, 2026 WL 2490916, at *3 (S.D.N.Y. Aug. 25, 2026).

As for "loss," the CFAA defines the term to "mean[] any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." Id. § 1030(e)(11). "Courts in this jurisdiction have construed loss narrowly, holding that the types of costs which the CFAA allows recovery for [must be] related to fixing a computer." DCR Mktg. Inc. v. Pereira, 2020 WL 91495, at *3 (S.D.N.Y. Jan. 8, 2020).

Patriot has alleged neither damage nor loss within the meaning of the CFAA. There is no allegation that the sweep of funds, or the disclosure of confidential information, impaired the functioning of Parker Group's systems in any way. Likewise, Patriot has not alleged

that any remediation was necessary to "fix[] a computer." Id. Instead, Patriot argues that the alleged loss consists of "the disclosure of proprietary trade secrets, confidential information, and other information, and the damage to good will and business reputation." ECF No. 89, at 29. While these allegations may describe loss or damage in the colloquial sense, they fail to meet these elements as a matter of the CFAA.

Patriot also urges that because SVB improperly swept funds from Parker cardholder accounts, Parker's systems now "now inaccurately reflect a zero balance." Id. But as SVB points out, see ECF No. 101, at 15, Patriot has not actually alleged that the account balances are wrong. Rather, Patriot's allegation is that SVB took money it was not entitled to. That Parker Group's system thereafter reflected a lower balance is not an impairment of the system within the meaning of the CFAA.

Accordingly, the Court concludes that Patriot has failed to allege loss or damage as required by the CFAA. Count Ten against SVB is therefore dismissed.

## V. Conclusion

For the foregoing reasons, the Court issued its October 13 "bottom-line," see ECF No. 132, which held as follows: the Court dismisses Counts Two through Six of SVB's amended complaint. The Court dismisses SVB's Count One insofar as it relates to Parker Card receivables generated on or after April 21, 2026; but the Court denies Patriot's motion to dismiss Count One to the extent that it relates

to receivables generated before April 21. Turning to Patriot's counterclaims against SVB, the Court dismisses Counts One, Three through Six, and Eight through Ten. The Court grants SVB's motion to dismiss Count Two, except insofar as this claim relates to SVB's role in the alleged concealment of Parker Group's insolvency. And the Court denies SVB's motion to dismiss Count Seven.

Dated: New York, NY
October 27, 2026

JED S. RAKOFF, U.S.D.J.